**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| X-CALIBER FUNDING LLC, as servicer for U.S. BANK, N.A., as trustee of the XCAL 2019-IL-1 MORTGAGE TRUST, | Civil Action No.: 1:24-cv-05529 |
| Plaintiff, | |
| v. | |
| MARK B. PETERSEN, | |
| Defendant. | |

MARK B. PETERSEN,

                      Third-Party Plaintiff,

   v.

JOSEPH C. TUTERA, WALNUT CREEK MANAGEMENT, L.L.C., and ILLINOIS DEBT ACQUISITION COMPANY, L.L.C.,

                      Third-Party Defendant.

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

Michael S. O'Reilly, Esq.
Marshall O. Dworkin, Esq.
SAUL EWING LLP
1270 Avenue of Americas, Suite 2800
New York, New York 10020
Tel: (212) 980-7200
Fax: (212) 980-7209
michael.oreilly@saul.com
marshall.dworkin@saul.com

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 4

ARGUMENT ..................................................................................................................... 12

    I.     Plaintiff Is Not Entitled To Summary Judgment Because it Has Unclean Hands .................................................................................................................. 12

    II.    Plaintiff Is Not Entitled To Summary Judgment Because it Failed to Act in a Commercially Reasonable Manner ................................................................... 17

    III.    Plaintiff Is Not Entitled To Summary Judgment Because Defendant Must Be Afforded the Opportunity to Take Discovery ................................................. 20

CONCLUSION .................................................................................................................. 25

53251595.7 10/23/2024

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................16

*Bank of China v. Chan,* 937 F.2d 780 (2d Cir. 1991) ...........................................14, 18

*Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.,* 361 F. Supp. 2d 283 (S.D.N.Y 2005) ...................................................................................................................13

*Berger v. U.S.,* 87 F.3d 60 (2d Cir. 1996) .....................................................................21

*Com/Tech Commc'n Techs., Inc. v. Wireless Data Sys., Inc.,* 163 F.3d 149 (2d Cir. 1998) ..................................................................................................................................13, 21

*E. Cap. Invs. v. GenTech Holdings, Inc.,* 590 F. Supp. 3d 668 (S.D.N.Y. 2022) ..............21, 22, 24

*Fed. Home Loan Mortg. Corp. v. Spark Tarrytown, Inc.,* 829 F.Supp. 82 (S.D.N.Y. 1993) ..................................................................................................................................23

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York,* 822 F.3d 620 (2d Cir. 2016) ..........13

*Genger v. Genger,* 76 F. Supp. 3d 488 (S.D.N.Y. 2015) ...............................................15

*Matsushita Elec. Indus. Co. Ltd., v. Zenit Radio Corp.,* 474 U.S. 574 (1986) .............................14

*Rodriguez v. City of New York,* 72 F. 3d 1051 (2d Cir. 1995) .........................................13

*Rule v. Brine, Inc.*, 85 F.3d 1002 (2d Cir. 1996) .............................................................13

*Senno v. Elmsford Union Free Sch. Dist.,* 812 F. Supp. 2d 454 (S.D.N.Y. 2011) ........................13

*State St. Glob. Advisors Tr. Co. v. Visbal,* 677 F. Supp. 3d 209 (S.D.N.Y. 2023) ......................15

*Sutera v. Schering Corp.,* 73 F.3d 13 (2d. Cir. 1995) .....................................................21

*Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506 (2d Cir. 1989) ........................21

*United States ex rel. Bogina v. Medline Industries, Inc.,* Case No. 11-c-05373, 2015 WL 1396190 (N.D.Ill. Mar. 24, 2015) ...............................................................................8

### STATE CASES

*Executive Bank of Fort Lauderdale v. Tighe*, 66 A.D.2d 70 (2d Dep't 1981)...............................17

*Federal Deposit Ins. Corp. v. Marino Corp.,* 74 A.D.2d 620 (2d Dep't 1980).......................17, 18

*GS Capital Partners, LLC v. FTE Networks, Inc.,* 76 Misc.3d 1089 (Sup. Ct. N.Y. Cnty. 2022) ....................................................................................................................................22, 25

*Marine Midland Bank v. CMR Industries, Inc.,* 159 A.D.2d 94 (2d Dep't 1990) ..................14, 18

*NatWest Bank N.A. v. Grauberd*, 228 A.D.2d 337 (1st Dep't 1996) ............................................18

## FEDERAL STATUTES

Fed. R. Civ. P. 56 ...........................................................................................................13, 16, 20

## STATE STATUTES

C.P.L.R. § 3213 ..........................................................................................................1, 13, 21, 22

N.Y. U.C.C 9-207 (McKinney 2014) ........................................................................................18

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1[1], Defendant Mark Petersen ("Petersen" or "Defendant") submits this Memorandum of Law in Opposition to the motion of Plaintiff X-CALIBER FUNDING LLC, as servicer for U.S. BANK, N.A., as trustee of the XCAL 2019-IL-1 MORTGAGE TRUST ("Lender" or "Plaintiff") for Summary Judgment in Lieu of Complaint (the "Motion"). For the reasons set forth herein, the Motion should be denied in its entirety.

## INTRODUCTION

Plaintiff's Motion papers would have this Court believe that this case involves nothing more than: Lender makes commercial loan to borrower; borrower defaults; borrower files for bankruptcy; and Lender files action to enforce a guaranty against Petersen on the defaulted loan. Plaintiff frames the action as simply business as usual. Nothing could be further from the truth.

Plaintiff and others (as set forth below) have orchestrated a scheme to take advantage of Petersen's months-long hospitalization from life-threatening liver failure, as well as a ransomware attack against several of his assisted living facilities, to collect a windfall by mismanaging and devaluing collateralized assisted living facilities while simultaneously inflating and enforcing a personal guarantee against Petersen.

Plaintiff provided a $40 million loan to Petersen Health Care ("PHC" or "Borrower") and approximately 10 assisted living facilities and their operators (the "Facilities") as a bridge towards financing approval from the United States Department of Housing and Urban Development ("HUD"). For the bridge loan, Plaintiff collateralized, among other things, the Facilities, their assets, as well as a personal guaranty by Petersen.

---

[1] It is unclear that Plaintiff's Motion is under Rule 56 and Local Rule 56.1, as it was originally made in State Court pursuant to CPLR 3213 as an action for Summary Judgment in Lieu of Complaint, for which there is no corresponding federal rule. At Plaintiff's request, the Court converted the Motion pursuant to CPLR 3213 to a motion for summary judgment herein although did not require Plaintiff to comply with Local Rule 56.1.

In October 2023, a ransomware attack on several of the facilities disabled PHC's billing and payroll systems. At the same time, Petersen—the CEO of PHC, a multi-generational family-owned business—was diagnosed with liver failure and told he had a short time to live unless he received a liver transplant. Rather than aiding or supporting PHC through this period, X-Caliber opportunistically declared the bridge loan in default on what amounts to technicalities and accelerated the entire debt despite that the Borrowers were current on their loan payments. While Petersen has been hospitalized and recovering from the effects of a fortuitous liver transplant in early 2024, X-Caliber misled the United States District Court for the Northern District of Illinois (as well as the United States Bankruptcy Court for the District of Delaware) to install a receiver over the Facilities for the stated purpose of maintaining their values for immediate sale. Instead, X-caliber has schemed with its appointed receiver and management company to run the Facilities into the ground, devalue the Facilities and intentionally increase Petersen's total exposure on the personal guaranty.

Only a couple of weeks ago—after Plaintiff filed this Motion—Plaintiff either assigned or sold all debt under the Loan Agreement to Illinois Debt Acquisition Company ("IDAC"), an entity owned and controlled by the principal of the appointed management company operating the Facilities for the receiver and whose registered agent is the receiver. IDAC immediately assigned back to X-Caliber the rights to pursue this Motion on Petersen's personal guaranty.

Now, Petersen's competitors are able to foreclose and keep all of the Facilities for their own benefit and presumably at a bargain price since the receiver and management company, with Plaintiff's assistance, have spent months devaluing the Facilities. At the same time, X-Caliber maintains all rights under Petersen's personal guaranty, and can take advantage of Petersen's growing (and calculated) exposure to maximize profits for its investors and stakeholders. This

obvious orchestration, self-dealing and bad faith should not be rewarded or countenanced by the Court and, through the third-party action and counter-claims being asserted by Petersen simultaneously herewith, should instead award damages to Petersen. Equity demands that the Motion be denied due to Plaintiff's unclean hands, and this Court must prevent Plaintiff from further self-dealing through its bad faith and inequitable conduct.

Plaintiff took control of the collateralized Facilities, held them hostage, refused to market them, kept them out of a PHC-related bankruptcy estate, and refused to continue paying down the loan in order to add nearly $500,000 per month on the amount claimed due on the loan. Plaintiff further has allowed the collateral be impaired and devalued. Plaintiff's conduct has robbed the Borrower of the opportunity to pay down the loan over the last ten months and has intentionally-inflated the amount sought under the Guaranty. Plaintiff's Motion now asks this Court not only to condone these actions but also to make Defendant pay for them.

The Motion further must be denied because Plaintiff has failed to meet its burden in showing there are no disputed issues of material fact, specifically including, but not limited to, whether Plaintiff has acted in a commercially reasonable manner – a requirement for enforcement of a guaranty under New York law.

Lastly, the Motion must be denied because Defendant requires discovery in order to defend himself and adequately oppose the Motion. To grant the Motion and deny Defendant the right to take discovery would be improper. The Court should instead deny the Motion and require this action to be litigated in the normal course, with full discovery and disclosure of Plaintiff's and its agents inequitable and reprehensible conduct.

## FACTUAL BACKGROUND[2]

### Petersen and Petersen Health Care

Petersen currently serves as the Chief Executive Officer of PHC, which was one of the country's leading long-term care provider and the largest chain of nursing homes and assisted, independent and supportive residential living communities in Illinois and the Midwest. (Declaration of Mark B. Petersen dated October 22, 2024, ¶¶ 1-2) ("Petersen Dec."). The company was formed in 1974 by Petersen's father and uncle, and remained family-owned providing various healthcare and rehabilitation services for elderly citizens in Illinois, Missouri, and Iowa in partnership with physicians, skilled nurses, and other health care providers. (Petersen Dec. ¶ 3). The Petersen family mission is to provide quality care focused on its residents and strong ties to the small rural, local communities it serves. PHC serves and continues to provide care for Medicaid eligible seniors when many providers do not. PHC often is the largest employer in the respective geographic area and has always emphasized a strong community presence through integration into the surrounding community. (Petersen Dec. ¶ 4).

Petersen grew up around PHC and served on the staff in a variety of positions, learning about the company, its employees, and residents from the ground up. In 2002, Petersen became the CEO and grew PHC into a major force in long-term care, with more than 100 facilities at one point in time. (Petersen Dec. ¶¶ 5-6). By the end of 2023, PHC controlled over 90 nursing homes containing over 6,796 beds and had an annual operating revenue exceeding $339.7 million. PHC employs nearly 4000 employees and is recognized as a major community partner in 43 communities throughout Illinois, eastern Iowa and Missouri. (Petersen Dec. ¶¶ 7-8).

---

[2] In addition to the facts set forth herein, Defendant also incorporates the facts and allegations set forth in Defendant's Counterclaim and Third-Party Complaint (Dkt. 20), as well as those in the Petersen Dec. and all documents and exhibits incorporated therein.

### X-Caliber's Bridge Loan

In and around October 31, 2019, X-Caliber issued a loan (the "Loan") to ten separate Petersen-affiliated facilities (the "Facilities") and their operating companies[3] in the amount of $40,000,000, pursuant to the terms and conditions of the October 31, 2019, Loan Agreement ("Loan Agreement").  In return, X-Caliber became, in addition to a fox in the henhouse, the Borrowers' senior secured creditor with liens on all of their assets.

The parties understood that the Loan was intended to be a bridge loan until HUD determined it would provide financing for each of the Facilities.  HUD reviews applications on an individual basis, so the Loan from X-Caliber was necessary to provide a financing bridge until HUD completed its review and approved each of the Facilities.  Indeed, Plaintiff stated in writing that it understood the Loan to be bridge financing until HUD approval (Petersen Dec. ¶¶ 14-15, Ex. A).  In addition to the Loan Agreement, Petersen signed a personal guaranty for the Loan owed by Borrowers to X-Caliber (the "Guaranty").

The relatively new Facilities were amongst the premier long-term care facilities in the PHC portfolio.  PHC and X-Caliber alike believed them the most qualified and likely to be accepted by HUD.  Indeed, X-Caliber expressly chose to provide the Loan based on the premier Facilities' serving as collateral.  Both Petersen and Lender understood that the value of the Facilities far exceeded the amount of the Loan.  No party to the Guaranty foresaw any need for its enforcement and Petersen, who considered the loan substantially over-collateralized, viewed it as a mere formality that he never would have signed had he thought otherwise.  (Petersen Dec. ¶¶ 16-17).

---

[3] Specifically, the Loan Agreement was between X-Caliber and El Paso HCC, LLC; Flanagan HCC, LLC; Kewanee AL, LLC; Knoxville AL, LLC; Legacy Estates AL, LLC; Marigold HCC LLC; Monmouth AL LLC and Polo LLC, which are owners of the property on which El Paso HCO, LLC; Flanagan HCO, LLC; CYE Kewanee HCO, LLC; CYE Knoxville HCO, LLC; Legacy HCO, LLC; Marigold HCO, LLC; CYE Monmouth HCO LLC and Polo HCO, LLC (collectively, the "Borrowers") operate skilled nursing and assisted living facilities.

**Petersen's Personal Health Issues**

Petersen was diagnosed with a very aggressive form of cirrhosis of the liver in the autumn of 2023. By November, he was hospitalized in Arizona and told he had little time left to live without a transplant. As a result, for reasons outside of his control, Petersen had little time to focus on PHC because he was focused on his family, health and survival. He had little knowledge of, much less involvement in, the events that occurred in late 2023 and early 2024, and, instead, relied on PHC's management team, attorneys and staff to make decisions. Fortunately, Petersen qualified and received a liver transplant on April 7, 2024. He continues to recover and recuperate, but the transplant left him hospitalized almost continuously from approximately Thanksgiving 2023 until July 2024. Despite the success, Petersen is regularly hospitalized for extended periods of time due to complications resulting from his liver transplant. (Petersen Dec. ¶¶ 9-13).

**Ransomware Attack and X-Caliber's Default**

In and around October 2023 while Petersen was hospitalized, PHC fell victim to a direct ransomware attack that prevented it from utilizing its billing and computer systems and shortly thereafter an indirect ransomware attack on a vendor that handled billing and other services for several health care facilities, including PHC. X-Caliber made no effort to help PHC resolve its logistical setbacks or financial difficulties caused by the ransomware attacks, nor did it alleviate any of the Loan Agreement's payment or other obligations in light of PHC's daunting situation. Plaintiff acted not like a partner but instead an opportunistic raider.

Despite the tumultuous events affecting PHC and the Facilities, the Borrower still prioritized its obligations under the Loan and on December 29, 2023, made a $4.5 million payment to Plaintiff to pay down the Loan. Notably, after receiving the payment and on the very same day, X-Caliber took advantage and declared an Event of Default on December 29, 2023 (the "Default

Notice"), pursuant to sections 5.37 and 6.2 of the Loan Agreement, and accelerated the debt to the amount of "[sic] $34,486,93.91." due to the ransomware attacks. (*See* Dkt. 1-1 at 207). Notably, neither of these sections address any failure to make payments to X-Caliber pursuant to the Loan Agreement because PHC complied with all such obligations leading up to this time.[4]

### **Appointment of a Receiver and Walnut Creek Management**

On January 23, 2024, while Petersen was still waiting on a possible liver transplant to save his life, X-Caliber initiated a receivership action in the United States District Court for the Northern District of Illinois, in the matter captioned *X-Caliber Funding, et al. v. El Paso HCC, LLC et al.*, Case No. 3:24-cv-50034 (the "Receivership Action"), and filed an emergency motion for the appointment of a receiver over the Facilities. Plaintiff's justification for the appointment of a receiver was that, among other things, a receiver would: (a) "stabilize the situation," (b) "assure creditors," and "carry out an organized sale of Defendants' assets that…creates recoveries for Defendants' creditors." (Petersen Dec., Ex. B, § 5).

X-Caliber repeatedly stated that the purpose of the receiver was to place the Facilities "in the best position to preserve and maximize the remaining value of…[the] assets for the benefit of [ ] creditors." To keep the Facilities under the care of PHC "would be catastrophic for creditors." In the motion for a receiver, X-Caliber proposed the appointment of Michael F. Flanagan of Flanagan & Associates, L.L.C. (the "Receiver" or "Flanagan"). On January 25, 2024, at a hearing before the Honorable Iain D. Johnston regarding the appointment of a receiver, Plaintiff's counsel stated that X-Caliber would "fund the shortfalls on these facilities until they can be stabilized and

---

[4] Section 5.37 of the Loan Agreement addresses compliance with Health Information Laws, which are broad, intricate, complicated and will necessarily be impacted by a ransomware attack. (*See, e.g.* Dkt 1-1 at 99, Section 5.37(a)) (requiring the Borrowers to be "in compliance with all applicable statutes, laws, ordinances, rules and regulations of any federal, state or local government authority with respect to regulatory matters…"). X-Caliber did not indicate in its Default Notice how PHC violated Section 5.37 of the Loan Agreement. Section 6.2 of the Loan Agreement addresses the need to provide X-Caliber with prompt written notice of certain material events, none of which expressly include a ransomware attack or other security issues. (*See id*. at 102.)

sold." This statement was false. (Petersen Dec. ¶¶ 19-20, 40-41, Ex. I). Plaintiff informed the Court that Flanagan would appoint Joseph Tutera ("Tutera") and his management company, Walnut Creek Management Company, L.L.C. ("Walnut Creek"), to manage the Facilities on behalf of the Receiver and "stabilize the situation…and/or have secured long term solutions." (Id.)[5] Tutera owns, operates and manages approximately 70 assisted living facilities in the Midwest, including several in the State of Illinois which are in direct competition with many PHC facilities. (Petersen Dec. ¶ 24). Tutera is not an operator with a reputation for putting the care of his residents and his duties to their communities first. Rather, his reputation is that the "bottom line" is above all.[6] Despite this reputation, on January 25, 2024, the court in the Receivership Action appointed the Receiver, and Walnut Creek and Tutera began managing the Facilities. (Petersen Dec. Ex. C).

Since Tutera and Walnut Creek's appointment as the management company, they have taken actions and managed the Facilities in ways that are detrimental to the Facilities' value, restricts the ability to accept new residents, and in a manner that is only beneficial to the creditor's potential recovery. (Petersen Dec. ¶ 27). Despite promising the Hon. Johnston that the intent was to sell the Facilities, there is no evidence that Walnut Creek, the Receiver or X-Caliber have made any attempts to sell or even market the Facilities since the Receiver's appointment. By contrast,

---

[5] Tutera and Flanagan are very close personally, and often work together on Flanagan's receiverships. In fact, Flanagan & Associates, L.L.C., is located at 7611 State Line Road, Kansas City, Missouri in Suite 303, and Tutera Senior Living is also located at the same address but at Suite 301. (Petersen Dec. ¶ 21).

[6] In *United States ex rel. Bogina v. Medline Industries, Inc.*, Case No. 11-c-05373, 2015 WL 1396190 (N.D.Ill. Mar. 24, 2015) ("Bogina Matter"), Tutera and Walnut Creek were accused of accepting millions of dollars in kickbacks and bribes if it purchased durable medical equipment from Medline Industries, Inc. ("Medline"). (Petersen Dec. ¶ 25). The Bogina Matter was a qui tam litigation brought by August Bogina, as relator on behalf of the United States and eleven (11) individual states. While the Bogina Matter dismissed claims against Tutera based solely on procedural and technical defects, the allegations against Tutera and Walnut Creek are specific, disturbing and consistent with a previous qui tam action against Medline in *United States ex rel. Mason v. Medline Indus. Inc.*, Case No. 07-C-5615. (Petersen Dec. ¶ 26).

virtually all of the facilities that were previously owned by PHC but were subject to the Bankruptcy Court for the District of Delaware[7] have already been sold to pay down PHC debt.

In a recent and surprising moment of candor from Plaintiff, a spokesman for X-Caliber was quoted in the press stating <u>not</u> that Plaintiff's goal is to "preserve value" of the collateral or to provide "stability" or "long term solutions" to eventually sell the Facilities for the benefit of creditors, as Plaintiff represented to the Courts in the Receivership and Bankruptcy Actions, but rather that Plaintiff's goal is an "optimal outcome for our stakeholders and investors," whatever form that may come in. Plaintiff is unjustly enriching itself at the expense of PHC and through this action is seeking to force Petersen to pay the tab. (*See* Oct. 23, 2024 Affirmation of Michael S. O'Reilly, Ex. A) ("O'Reilly Aff.").

### <u>Tutera and Walnut Creek's Mismanagement Devalues The Facilities</u>

Though X-Caliber told the court in the Receivership Action that it would cover any shortfalls of the Facilities, in part, to maintain their value, Plaintiff and its agents Flanagan and Walnut Creek immediately and intentionally stopped making any interest payments or payments on taxes and insurance from operating revenue upon their appointment, thereby causing the amount owed to X-Caliber under the Loan Agreement and Guaranty to increase dramatically.

Moreover, oversight and accountability of the receiver, Tutera and Walnut Creek is now limited since, as noted in a Court filing, Tutera and Walnut Creek "moved billing, payroll and all operational management from the Petersen centralized management to management by his own new manager." Aside from periodic vague monthly financial statements that the Receiver issues to the court in the Receivership Action, there is little to no oversight or questioning of Walnut Creek and Tutera's actions. (Petersen Dec. ¶ 28).

---

[7] *In re SC Healthcare Holding, LLC, et al.*, Case No. 24-10443 (TMH).

As detailed in the Petersen Declaration, Walnut Creek and Petersen have taken specific actions and policies that have resulted in the precipitous decrease in the number of residents at the facilities, a decrease in profitability, and a substantial increase in expenses. (Petersen Dec. ¶ 29-35). PHC's history running the Facilities shows objectively and unequivocally that Plaintiff and its agents have run the facilities into the ground. Prior to the installation of Walnut Creek and Tutera, it is an indisputable fact that these Facilities were successful assisted living facilities. Petersen does not believe that it is a coincidence that the only parties to benefit from this mismanagement and devaluation are Plaintiff, Tutera and the receiver while the sole parties harmed are PHC and, more so, Petersen due to his risk associated with this action.

Further, Tutera has also begun to personally "poach" key employees and staff away from PHC and the Facilities to work at Tutera's own facilities, in order to further undermine the success and capabilities of the Facilities and further impair the value of the collateral. Tutera's intent to take over the Facilities for his own, as described more fully below, is evident since he told at least one regional staff member that they should leave PHC for Tutera's facilities because "you are going to be working for us anyway." (Petersen Dec. ¶ 35)

**Receiver's Intent to Close El Paso and Polo**

On October 8, 2024, the Receiver informed counsel for PHC that he intended to close Polo and El Paso because Polo allegedly had an expensive boiler system issue, and El Paso was deemed unprofitable. Both of these meritless justifications only cement Walnut Creek and Tutera's intent to devalue the Facilities for the benefit of Tutera and X-Caliber (Petersen Dec. ¶ 36-37).

First, the Receiver stated that due to a boiler system issue at Polo that allegedly "needs significant mechanical repairs and/or replacement in order to be able to work and heat the building properly," he was going to implement an "emergency evacuation" of residents and relocate the

majority of them to other Tutera and Flanagan-owned facilities in Dixon, Illinois.  The Receiver's justification for the "temporary closure" was that he learned, upon information and belief, from Walnut Creek that repairing or replacing the boiler plate system at Polo would cost "at least" $250,000, and there are "not funds to use to address this issue."  (Petersen Dec. Ex. H).  The Receiver provided no proposal or estimate to support the extraordinary cost.  Indeed, Petersen, despite decades in the industry in the same exact geographical locations, has never in his career ever heard of an assisted living facility closing down due to a boiler issue and knows first-hand that boiler issues are resolvable for far less than $250,000.  (Petersen Dec. ¶ 39).  Plaintiff asks this Court not to consider that its agents' proposed actions and justifications go directly against its representation to the Receivership Court that X-Caliber would "fund the shortfalls on these facilities until they can be stabilized and sold."  Instead, X-Caliber is directing its agents to temporarily close this facility, depreciating its value while simultaneously enriching Walnut Creek and Tutera by transferring patients at Polo to Tutera-owned facilities and then selling the right to foreclose on and obtain these Facilities for himself to Tutera.  (Petersen Dec. ¶¶ 40-42).

The Receiver also announced that the "operating losses at El Paso are huge…with no end in sight" and therefore he determined that "El Paso cannot operate as a viable business entity." Accordingly, the Receiver stated he would request permission from the Court to seek closure from the Illinois Department of Public Health and relocate the majority of residents to "other facilities located through the State of Illinois" – no doubt, to many Tutera-owned facilities.  (Petersen Dec. ¶ 43).  The closing of El Paso is particularly egregious, and most clearly reveals Plaintiff and Walnut Creek's scheme to devalue the properties, because Walnut Creek and Tutera have apparently turned a profitable and successful assisted living facility into a financial failure, as

shown above.  El Paso was one of PHC's most successful assisted living facilities, and now, under Tutera's management, it allegedly cannot even keep its doors open.  (Petersen Dec. ¶ 44).

### X-Caliber Assigns The Debt To IDAC But Keeps The Claim Against Petersen

On October 11, 2024, while this Motion was pending, X-Caliber assigned all debt underlying the Loan and the accompanying Loan documents to IDAC.  (Petersen Dec. ¶ 46; Ex. J).  Coincidentally, IDAC's Articles of Organization ("Articles") were filed on the very same day the debt was assigned/sold to it from X-Caliber.  Under the Articles, the Flanagan – the Receiver - is listed as IDAC's registered agent while Tutera – managing PHC's Facilities - is the sole organizer listed.  Flanagan is also listed as the individual the filed Articles should be addressed and returned to.  (Petersen Dec. Ex. K).  It is undisputed that Tutera - the principal of the management company currently managing the PHC Facilities, decreasing the census, profitability and value of those Facilities with little to no oversight as to how he is managing the Facilities -- now has the right to foreclose on the Facilities and seek judgment against PHC and Petersen—a long-time competitor.  As if that was not evidence enough of self-dealing amongst Plaintiff and its agents - on October 14, 2024, IDAC *assigned back to X-Caliber* all claims against Petersen under the Guaranty. (O'Reilly Aff., Ex. B)  As a result, Tutera, who utilized Walnut Creek to devalue the Facilities, can now foreclose on those properties and either keep them under IDAC or sell them at discount rates to other Flanagan or Tutera-entities while X-Caliber maintains its Guaranty claims against Petersen for an ever-growing amount, as the Facilities continue to be devalued by Tutera and the collateral becomes irrelevant at Petersen's expense.  (Petersen Dec. ¶ 49-51).

### ARGUMENT

### I.    Plaintiff Is Not Entitled To Summary Judgment Because it Has Unclean Hands

"In ruling on a motion for summary judgment, the district court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party

opposing summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The court's only function is "to determine whether there is a genuine issue to be tried." *Id.* "A fact is material if it might affect the outcome of the case under governing law" and "[a] dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 631 n.12 (2d Cir. 2016); *Senno v. Elmsford Union Free Sch. Dist.,* 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (quoting *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d. Cir. 2009). This well-settled precedent mandates denial of the Motion, as even on the scant record as it currently exists the Court can determine that numerous genuine issues must be tried.

To prevail on a summary judgment motion, the court must determine that "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine issue of material fact exists and is therefore entitled to judgment as a matter of law. *Rodriguez v. City of New York,* 72 F. 3d 1051, 1060-61 (2d Cir. 1995).[8] The Motion fails to meet this burden precisely because the conduct of Plaintiff and its agents Flanagan and Tutera, as painstakingly set forth above and in the accompanying Petersen Declaration and all exhibits attached thereto, at the very least raise triable issues of genuinely-disputed material fact concerning the enforceability of the Guaranty but in truth establish that Plaintiff comes to this Court with unclean hands. In either instance, the Motion must be denied.

If, as here, a genuine issue of material fact exists "from which a reasonable inference could be drawn in favor of the non-moving party," summary judgment <u>must be denied</u>. *Bear, Stearns*

---

[8] When Defendant removed to the Southern District of New York, "the regime of the Federal Rules replaced that of C.P.L.R. § 3213." *Com/Tech Commc'n Techs., Inc. v. Wireless Data Sys., Inc.,* 163 F.3d 149, 151 (2d Cir. 1998) (citing Fed.R.Civ.P. 81(c)).

*Funding, Inc. v. Interface Group-Nevada, Inc.,* 361 F. Supp. 2d 283, 290 (S.D.N.Y 2005) (citing *Chambers v. TRM Copy Centers Corp.,* 43 F. 3d 29, 37 (2d. Cir. 1994). Where, as here, the non-moving party demonstrates specific materially-factual disputes that warrant a genuine issue for trial, summary judgment <u>must be denied</u>. *Matsushita Elec. Indus. Co. Ltd., v. Zenit Radio Corp.,* 474 U.S. 574, 587 (1986); *see also Bank of China v. Chan,* 937 F.2d 780, 786 (2d Cir. 1991) (holding that a triable issue exists based on nothing more than the amount of damages a creditor is entitled to collect on a debtor's guaranty amount); *Marine Midland Bank v. CMR Industries, Inc.,* 159 A.D.2d 94, 107 (2d Dep't 1990) (concluding summary judgment cannot be granted where outstanding questions regarding the creditor's commercial reasonableness in disposing the collateral exist). Defendant has shown unequivocally that a substantial number of reasonable inferences can be drawn in his favor, and therefore the Motion must be denied.

Again, Plaintiff's conduct both directly and indirectly through its agents, create genuine issues of material fact regarding whether Plaintiff adhered to commercially reasonable standards regarding its treatment of the collateralized Facilities, in unilaterally declaring a default due **<u>not</u>** to non-payment (as the Motion papers would have this Court believe) but to a ransomware attack, in refusing to apply any operating revenue at all to servicing of the Loan and paying down the debt and other obligations such as taxes, assigning/selling the debt underlying the Loan to direct competitors of Defendant and in intentionally inflating the amounts due under the Loan while destroying the collateral to maximize the amounts purportedly due through the Guaranty and, in Plaintiff's own words, relentlessly marching toward the "optimal outcome for our stakeholders and investors" regardless of the fact that Plaintiff's conduct destroyed the business that Defendant and his family built into one of the largest operators of assisted living facilities in the country.  All with an aim to maximize and achieve the "optimal outcome" by inflating the amounts Plaintiff

claims are due under the Loan Agreement and therefore are ostensibly recoverable here through the Guaranty.

Plaintiff is not trying to line its pockets at Petersen's expense – it is trying to stuff them until they burst and it cares not that, in the process, it has completely destroyed a thriving and successful family-built business that serves the needy and has been continuously growing and operating profitably for more than fifty years since 1974.  Although PHC was forced into Bankruptcy in part due to Defendant's life-threatening organ failure combined with the simultaneous ransomware attacks while he was in hospital, it was Plaintiff's unilateral declaration of a default and acceleration of all amounts under the Loan Agreement that forced Petersen's hand and was the proximate cause of PHC filing for Bankruptcy protection. Under the circumstances, the relief Plaintiff seeks is not only inequitable and improper but is downright reprehensible.  The tiny grime-covered hands that Plaintiff hopes to put into those pockets to reap its ill-gotten gains directly at Petersen's expense are unclean.  The Motion must be denied.

This Court has routinely denied summary judgment when there is evidence that plaintiff has unclean hands and engaged in "inequitable conduct or bad faith where the misconduct has a material relation to the equitable relief that plaintiff seeks." *State St. Glob. Advisors Tr. Co. v. Visbal,* 677 F. Supp. 3d 209,  (S.D.N.Y. 2023), *adhered to on reconsideration*, No. 1:19-CV-1719-GHW, 2023 WL 4764021 (S.D.N.Y. July 25, 2023); *citing Laugh Factory, Inc. v. Bascinao*, 608 F. Supp. 2d 549, 560 (S.D.N.Y, 2009) (denying summary judgment because of plaintiff's inequitable negotiation practices which "[make] the unclean hands doctrine applicable to plaintiff's claims for equitable relief."); *cf. Genger v. Genger,* 76 F. Supp. 3d 488, 503 (S.D.N.Y. 2015) (refusing to grant summary judgment based on promissory estoppel due to unclean hands because, unlike here, there was no evidence that plaintiff breached any duty to the defendant or

engaged in conduct that was immoral or unconscionable). Plaintiff's immoral and unconscionable conduct precludes summary judgment. To say that Plaintiff has engaged in bad faith and inequitable conduct is far from a stretch and Plaintiff's misconduct has a definite and undeniable relation to the relief it seeks. Everything Defendant knows to date--despite an uncooperative and reckless Plaintiff hellbent on maximizing the "optimal outcome" for its own stakeholders while actively working against Defendant's interests and to destroy his business-- and has set forth in this opposition he discovered on his own and while recovering from a major organ transplant, in the midst of ransomware attacks, a Receivership Action and a Bankruptcy.

Imagine what facts will come to light should this Court deny the Motion and require Plaintiff to actually litigate this action and be subject to full and open discovery under the Federal Rules of Civil Procedure, rather than abiding Plaintiff's wishes to have summary adjudication on nothing other than a set of admittedly very strong yet misleadingly sterile set of documents in the Loan Agreement and Guaranty. Plaintiff has already presented in the Motion and will reply with a further disputed set of facts. It is not the function of this Court to determine at this juncture which set of facts upon which the action will be decided. It is not the function of this Court to determine at this juncture which set of facts is more believable.

"Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Id*. (noting that weighing of the evidence is for the fact finder); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). Indeed, "[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56, 1963 advisory

committee's note to (e). Defendant has the right to have a jury observe the demeanor of the witnesses in this action.  When the jury hears this story from Mark Petersen, it will forget what Plaintiff's witnesses even said.  Summary judgment is inappropriate. The Motion must be denied.

## II.    **Plaintiff Is Not Entitled To Summary Judgment Because it Failed to Act in a Commercially Reasonable Manner**

Plaintiff's claim against Petersen fail as a matter of law because the undisputed facts do not establish that it acted in a commercially reasonable manner.  Plaintiff is not entitled to summary judgment because there is a genuine dispute of material fact as to the commercial reasonableness of Plaintiff's control, preservation, and refusal to dispose of the collateralized Facilities. Had the collateral been sold off as represented in Plaintiff's receivership documents or in a sale as proposed by the bankruptcy court, the amount owed, if any, on the Guaranty would be drastically less.. Instead, Plaintiff held the collateral hostage, claiming the receiver and his management company are "working toward and/or have secured long term solutions"  all while Plaintiff added $500,000 per month in interest and penalties onto the amount purportedly owed under the Guaranty. Plaintiff's conduct was not only contrary to what it represented to several Courts, but it also was commercially unreasonable in their preservation and disposition of collateral.

 Plaintiff argues that Petersen waived all recourse pursuant to the express terms of the Guaranty.  Plaintiff contends that Petersen "expressly and irrevocably waive[d] all defenses in an action brought by Lender to enforce this Guaranty based on claims of waiver, release, surrender, alteration or compromise and all setoffs, reductions, or impairments, whether arising hereunder or otherwise." (Guaranty Section 6(c)). However, under both the New York Uniform Commercial Code and New York common law, a secured party has a **non-waivable** duty to exercise reasonable care in the custody and preservation of collateral in its possession. *See Federal Deposit Ins. Corp. v. Marino Corp.,* 74 A.D.2d 620 (2d Dep't 1980); *Executive Bank of Fort Lauderdale v. Tighe*, 66

17

A.D.2d 70 (N.Y. 1981) ("a secured party's duty to act with due diligence, reasonableness and care may not be disclaimed by agreement… the parties may not agree to relieve the secured party from all responsibility with respect to the collateral."); N.Y. U.C.C 9-207 (McKinney 2014). While Plaintiff may contend that the protection of commercial reasonableness only extends to debtors, the Second Circuit in *Bank of China v. Chan* found that a guarantor also may not waive the defense of commercial unreasonableness under the New York Uniform Commercial Code. *See Bank of China v. Chan*, 937 F.2d 780, 285-86 (2d Cir. 1991).

New York courts have consistently found triable issues of fact where there exists a dispute over whether a creditor's preservation of collateral or refusal to sell collateral was commercially reasonable. *See Bank of China*, 937 F.2d at 789 (2d Cir. 1991) (holding that it would be inequitable to enforce an absolute guaranty against guarantor where the creditor failed to handle collateral in a commercially reasonable manner); *Marino Corp*., 74 A.D.2d at 621 (finding triable issues of fact as to the creditor's potential negligence in failing to preserve collateral and dispose of collateral in a commercially reasonable manner, holding "[t]o enforce such a waiver provision in the face of a triable issue of fact as to the creditor's negligence would allow a creditor to shield itself from its own tortious conduct"); *Marine Midland Bank v. CMR Industries, Inc.* 159 A.D.2d 94, 107 (2d Dep't 1990) (holding that a triable issue of fact existed as to the commercial reasonableness of a creditor holding on to collateral for over a year before proceeding against the guarantor); *NatWest Bank N.A. v. Grauberd*, 228 A.D.2d 337 (1st Dep't 1996) (holding summary judgment should have been denied on the grounds that defendant raised triable issues of fact regarding the preservation of collateral).

When X-Caliber seized control of the collateral through the Receivership Action in January 2024, one of the main reasons Plaintiff asserted for the necessity of a receivership was to "carry

out an organized sale of Defendant's assets that protects the health and safety of residents and creates recoveries for Defendant's Creditors." (Petersen Dec., Ex. B at 10). However, prior to its recent sham transaction in selling the underlying debt to Tutera, Plaintiff had not communicated any plans to sell the collateralized Facilities, instead repeatedly asserting that the receiver is "working toward or having secured long term solutions." (Petersen Dec., Ex. D, ¶ 37)While the receiver was purportedly but not actually doing this, Plaintiff has increased the interest and penalties on the Loan by approximately $500,000 every month for 10 months and seeks to collect those amounts from Petersen here through the Guaranty. (*See* Dkt. 1-1 at 210) Plaintiff's commercial reasonableness, or more appropriately lack thereof, has been exposed by the fact that all of the other facilities owned and operated by PHC have already been sold in the Bankruptcy Action – which was filed and began two months *after* the Receivership Action. Plaintiff actively and successfully fought to keep the collateral out of the bankruptcy estate by contending the receiver is "clearly in the best position to preserve and maximize the remaining value of Subject Debtors' assets for the benefit of its creditors" while "working toward and/or having secured long term solutions." (Petersen Dec., Ex. D, ¶). Yet the undisputed facts show that the Receiver did not, in fact, "preserve and maximize the remaining value" of the Facilities for the "benefit of its creditors". Instead, it turns out, that the Receiver was in the best position to unreasonably hold the Facilities until Plaintiff this month decided to sell the underlying debt (and the right to foreclose on the Facilities) to Tutera– a direct competitor of Defendant who is squarely in Plaintiff's pocket--for an unknown amount. Rather than preserving the value of the collateral to sell for the benefit of creditors, Plaintiff impaired the value of the collateral to such an extent that it essentially gave away the collateral for far less than it is worth, refusing to mitigate its alleged damages and instead opting to pursue Petersen on the Guaranty here for the obnoxiously inflated amount it seeks to

recover through the Motion.  Plaintiff's actions were not reasonable – commercially or otherwise. This disputed fact alone precludes summary judgment.  The Motion must be denied.

Once Plaintiff was able to keep the collateral outside of the bankruptcy and within the largely unsupervised Receivership Action, Plaintiff again refused to consent to a sale of all the debtor's assets in the bankruptcy estate. The allocation from the potential sale on the terms set in the Bankruptcy sale would have at a minimum gained $14.2 million dollars of against what Plaintiff seeks here – which is in excess of $35 million dollars. (*See* Dkt. 1-1, at 210).

Plaintiff has acted  in a commercially unreasonable manner with respect to the collateral by keeping the collateral outside of bankruptcy, preventing a sale at the request of the bankruptcy estate, and holding collateral hostage while still accruing interest and penalties it seeks from Defendant. Had there been any commercially reasonable efforts to preserve the value and dispose of the collateral, the amount due under the Guaranty, if any, would be substantially less than the inflated amount Plaintiff seeks from Petersen. Thus, there is a genuine dispute of material fact as to the amount due, if any, under the Guaranty, in addition to whether Plaintiff's lack of effort to preserve and dispose of the collateral was commercially reasonable. The Motion must be denied.

## III.    Plaintiff Is Not Entitled To Summary Judgment Because Defendant Must Be Afforded the Opportunity to Take Discovery

Although Plaintiff has been operating for its own benefit in the dark for over ten months now, it is incumbent upon this Court to shine a light on Plaintiff's conduct and allow Defendant to take discovery of Plaintiff to establish its meritorious defenses to Plaintiff's claims in addition to its causes of action against Plaintiff, Tutera and Walnut Creek.  The Motion should be denied as Defendant never had an opportunity to take essential discovery of Plaintiff.  FRCP 56 (d)(2). If a nonmovant demonstrates "by affidavit or declaration that . . . it cannot presents facts essential to justify its opposition," a court should afford the opportunity to conduct discovery. *Id*. It is well-

settled that "[t]he nonmoving party must have 'had the opportunity to discover information that is essential to his opposition' to the motion for summary judgment." *Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5 (1989)); *see also Berger v. U.S.,* 87 F.3d 60, 65 (2d Cir. 1996) (holding that it was premature for the district court to grant summary judgment since there was not an opportunity for discovery); *Sutera v. Schering Corp.,* 73 F.3d 13, 18 (2d. Cir. 1995) (concluding that summary judgment was inappropriate since plaintiff did not have an opportunity to obtain evidence in support of opposition to the motion).

Plaintiff attempted to avoid discovery of its conduct here by filing a motion under CPLR § 3213 for summary judgment in lieu of a complaint. When Defendant removed this case to federal court, however, federal rules replaced that of the CPLR. *Com/Tech Commc'n Techs., Inc. v. Wireless Data Sys., Inc.,* 163 F.3d 149, 151 (2d Cir. 1998). Because CPLR § 3213, which does not afford Defendant an opportunity to examine any evidence opposing the Motion, has been replaced by the Federal Rules, discovery is required at this juncture, and Defendant will be irreparably damaged if the opportunity to take discovery of Plaintiff is not granted by this Court.

In a decision in a similar action similar, this Court found that summary judgment could not be granted because of a genuine dispute of fact regarding the lender's "corrupt intent" to obtain an interest rate greater than that permitted by state law. *E. Cap. Invs. v. GenTech Holdings, Inc.,* 590 F. Supp. 3d 668, 680 (S.D.N.Y. 2022). This Court found that defendant's affirmative defenses created triable issues of fact precluding summary judgment, particularly its defense that the subject promissory note was "criminally usurious under Florida law, and is therefore unenforceable." *Id.* at 676. Despite this Court's finding that the plaintiff's effective interest rate was permitted under Florida law, it denied summary judgment because "there are not enough facts on the record to

determine [if] the . . . legal fees and administrative costs were legitimate costs [the lender] incurred in preparing and executing the loan." *Id.* at 680.

By the same token, the Supreme Court of New York County found that defendants in a suit for breach of a promissory note must be afforded an opportunity for discovery since the defendants' defense *required* discovery. *GS Capital Partners, LLC v. FTE Networks, Inc.,* 76 Misc.3d 1089, 1093 (Sup. Ct. N.Y. Co. 2022).  In *GS Capital Partners,* the lender commenced action against the borrow seeking enforcement of a promissory note which allowed the borrower to purchase securities at a discount. *Id.* at 1090. When the borrower became delinquent by failing to complete its Securities and Exchange Commission filings, the lender alleged the borrower defaulted on the note and in lieu of a complaint, the lender filed a motion for summary judgment under CPLR 3213. *Id.* Among its defenses, the borrower alleged that "the Note is criminally usurious." *Id.* 1091. The court found that "[the borrowers] have raised factual disputes that could give rise to a *potentially* meritorious criminal usury defense" and since usury is a "fact-specific affirmative defense," the borrow should have an opportunity for discovery. *Id.* at 1093.

Defendant cannot determine how Plaintiff has calculated the interest and penalties under the Loan Agreement and therefore is bereft of the information he needs to defend against the amounts Plaintiff seeks here, including but not limited to the interest on the Guaranty.  The interest rate may very well be criminally usurious under New York law and, had Plaintiff filed a Complaint containing factual allegations to which Defendant could assert affirmative defenses (which Plaintiff has not done), Petersen would certainly assert that the interest rate is criminally usurious under New York law.

Plaintiff's seizure of control over the Facilities - Defendant's assets – and the unreasonable manner in which Plaintiff has treated the collateral as set forth above, raises several triable issues

of fact. Specifically, Defendant requires discovery regarding Plaintiff's treatment of the collateralized Facilities, in Plaintiff's conduct in unilaterally declaring a default under the Loan Agreement **not** due to non-payment but instead due to a ransomware attack, in refusing to apply any operating revenue at all to servicing of the Loan and paying down the debt and other obligations such as taxes, in assigning/selling the debt underlying the Loan to direct competitors of Defendant and in intentionally inflating the amounts due under the Loan while destroying the collateral to maximize the amounts purportedly due from Defendant through the Guaranty and, in Plaintiff's own words, in relentlessly marching toward the "optimal outcome for our stakeholders and investors" regardless of the fact that Plaintiff's conduct utterly destroyed the business that Defendant and his family built into and maintained as one of the largest operators of assisted living facilities in the country. Because Defendant has potentially meritorious defenses and Plaintiff has breached its duties, Defendant should have an opportunity for discovery.

Further, pursuant to the Receivership Order, Walnut Creek and Tutera, as an arm of the court, have a duty to "manage, operate, preserve and maintain the Receivership Assets as a prudent person would, including . . . the power to enter into, terminate or negotiate contracts and make repairs or alterations to the Receivership Assets that Receiver in its business judgment reasonably believes necessary for the management, operation, preservation and maintenance of the Receivership Assets and to maximize their value."  (Petersen Dec., Ex. C, ¶ 4).  *See also Fed. Home Loan Mortg. Corp. v. Spark Tarrytown, Inc.,* 829 F.Supp. 82, 85 (S.D.N.Y. 1993) (finding that "[a] receiver acts 'as an officer of the courts and has the duty to preserve and protect the property pending the outcome of the litigation'") (citing *Citibank, N.A. v. Nyland (CF8) Ltd.,* 839 F.2d 93, 98 (2d Cir. 1988).

Instead of upholding its fiduciary duty and acting as an officer of the court, acting as agents instead for Plaintiff, Flanagan and Tutera's conduct in the Receivership Action have detrimentally impaired the value of the Facilities, decreased the census by preventing the admission of new residents while actively transferring PHC residents from the Facilities to homes they themselves own and operate, and acted in their own self-interest by scheming with Plaintiff to assign/sell the underling debt to a company affiliated with and/or owned by Flanagan and Tutera. While these actions are unfortunately consistent with Flanagan and Tutera's reputations as working for their own self-interests and in bad faith as set forth above, that does not change the absolute requirement that Petersen be given the opportunity to take discovery of Plaintiff and its agents to reveal the truth.

Tutera and Walnut Creek's mismanagement of the Facilities on their own and Plaintiff's behalf have now led to the proposed ultimate closure of these historically profitable facilities. At this stage of the litigation and without discovery, Defendant has no other explanation of Tutera and Walnut Creek's conduct other than to plausibly assume that the Receiver *intentionally* depreciated the Facilities, allowed Plaintiff to sell them to Tutera and Flanagan for pennies on the dollar, and then pursue Defendant for any outstanding amount on the loan. However, it would be inequitable and improper for this Court to base any decision on the Motion upon assumptions or anything less than all relevant facts. Discovery is required and the Motion must be denied.

There are serious, triable issues of fact related to the Receiver's management of the facilities that preclude summary judgment and require discovery. *GenTech Holdings, Inc.,* 590 F. Supp. 3d at 676 (holding that defendant's argument that the promissory note was criminally usurious created a triable issue of fact). These allegations are not conclusory. Rather, Defendant asserts there are potentially meritorious defenses to this action, which require an opportunity for

discovery. *GS Capital Partners, LLC v. FTE Networks, Inc.,* 76 Misc.3d 1089, 1093 (2022) (finding that the summary judgment should be denied because the borrowers raised factual disputes that could give rise to a potentially meritorious claim). The Motion must be denied.

## **CONCLUSION**

For the foregoing reasons, Defendant Mark B. Petersen respectfully requests that the Court deny Plaintiffs' Motion for Summary Judgment in Lieu of Complaint and grant any other and further relief it deems just and proper.

Dated: October 23, 2024
      New York, New York

                    Respectfully Submitted,
                    By: _/s Michael S. O'Reilly_

                    Michael S. O'Reilly, Esq.
                    Marshall O. Dworkin, Esq.
                    SAUL EWING LLP
                    1270 Avenue of the Americas, Suite 2800
                    New York, New York 10020
                    P: (212) 980-7200
                    F: (212) 980-7209
                    michael.oreilly@saul.com
                    marshall.dworkin@saul.com

                    *Attorneys for Defendant/Counterclaimant/Third-Party Plaintiff Mark B. Petersen*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment in Lieu of Complaint was filed with the Clerk of this Court via CM/ECF, which sent notification to all counsel as follows:

John Conners Kessler
Blank Rome LLP
1271 Avenue of Americas
New York, NY 10020
jkessler@blankrome.com

This the 23rd day of October, 2024.

/s/ Michael S. O'Reilly
Michael S. O'Reilly

10/23/202453251595.7