# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| **In re** | Chapter 11 |
| **SC HEALTHCARE HOLDING, LLC** *et al.*, | Case No. 24-10443 (TMH) |
| **Debtors.**[1] | Joint Administration Requested |

### DECLARATION OF DAVID R. CAMPBELL IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, David R. Campbell, pursuant to 28 U.S.C. § 1746, under penalty of perjury, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      Since November 2016, I have been a Managing Director of Getzler Henrich and Associates, LLC ("Getzler Henrich"), a restructuring advisory services firm that specializes in providing operational and financial services to middle-market businesses and their stakeholders. In this capacity I lead the Getzler Henrich's healthcare advisory practice.  As of March 12, 2024, I serve as the Chief Restructuring Officer (the "CRO") of all of the above-captioned debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors," the "Company," or "Petersen").

2.      In addition to my appointment as CRO, Getzler Henrich has been retained by the Company to serve as its financial advisor.  The Debtors previously engaged Getzler Henrich as their financial advisor in July 2018 to assist in the evaluation of strategic alternatives, including

---

[1]      The last four digits of SC Healthcare Holding, LLC's tax identification number are 2584.  The mailing address for SC Healthcare Holding, LLC is c/o Petersen Health Care Management, LLC 830 West Trailcreek Dr., Peoria, IL 61614.  Due to the large number of debtors in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information will be made available on a website of the Debtors' proposed claims and noticing agent at www.kccllc.net/Petersen.

debt or equity financing.  I have worked closely with the Debtors' management and other professionals retained by the Debtors with respect to the Debtors' financing and restructuring efforts.  As leader of the current and prior engagements, I have independently reviewed, have become familiar with, and have personal knowledge regarding the Debtors' day-to-day operations, businesses, financial affairs, and books and records, and I am well acquainted with the Debtors' capital structure, liquidity needs, and business operations.

3.      A list of the Debtors and their non-Debtor affiliates is attached as **Exhibit A**.  A map noting the geographic locations of the Company's various healthcare facilities (each, a "Facility," and collectively, the "Facilities") is attached as **Exhibit B**.  And, finally, a chart reflecting the Debtors' corporate structure, with limited description of the general first (or second) priority lien interests in certain of the Debtors' assets and operations, is attached as **Exhibit C**.[2]

4.      I have over 20 years' experience with in- and out-of-court restructurings and recapitalizations, mergers and acquisitions and divestiture initiatives.  I have worked with companies, private equity firms, commercial banks, direct lenders, and family offices and by providing leadership, operational and strategic advice in a wide range of corporate finance transactions, including restructurings and reorganizations, mergers and acquisitions, and debt and equity financings.  Prior to Getzler Henrich, I was a managing director in the Capital Markets group at Fifth Third Bank, where I covered private equity sponsors.  I was also a managing director with Almeric Capital Partners, a credit opportunity fund focusing on distressed first- and second-lien leveraged loans.  Earlier, I served as a senior vice president with GE Capital's Health Care

---

[2]      As noted in Exhibit C, references made therein to lenders shall refer generally to the lender (or lenders) that may have security interests in some or all of the assets owned by entities on the respective page of the organizational chart.  Such notations, including whether a person or entity is a borrower or guarantor, shall not be considered consent or waiver of the Debtors' rights and claims with respect to challenges of the nature, extent or priority of any of such lenders' liens, claims, or encumbrances, all of which remain preserved.

Finance group and a principal at Potak, Campbell & Co., a boutique corporate restructuring firm providing advisory services to unsecured creditors.

5.      I graduated with an MBA from the University of Chicago's Booth School of Business and received a Masters' Degree from the University of Chicago's Harris School of Public Policy.  I received a Bachelor of Arts from Boston University.

6.      On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed petitions for relief (the "<u>Petitions</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>"), thereby commencing these voluntary cases (these "<u>Chapter 11 Cases</u>").

7.      I submit this declaration (this "<u>Declaration</u>") in support of the Debtors' Petitions and the Debtors' related requests for initial relief in the form of motions and applications (the "<u>First Day Motions</u>"),[3] as well as to assist the Court and parties in interest in understanding the circumstances that led the Company to commence these Chapter 11 Cases.

8.      I am generally familiar with the contents of each First Day Motion (including the exhibits thereto) and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, as well as to avoid immediate and irreparable harm to the Debtors' estates.  The approval of the First Day Motions would assist the Debtors in maximizing the value of their estates and best serves the interests of the Debtors' estates and creditors.

9.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge; information supplied to me by other employees of Getzler Henrich and

---

[3]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the applicable First Day Motions.

members of the Company's management, professionals, and other advisors; my review of relevant documents; or my opinion based upon my experience and knowledge of the Debtors' industry, operations, and financial condition.  If called to testify, I could and would testify competently as to the facts set forth herein.  I am authorized to submit this Declaration.

<div align="center">*     *     *     *     *</div>

10.     To familiarize the Court with Petersen, its businesses and the circumstances leading to these chapter 11 cases, this Declaration is organized into four sections:

(i)     **Part I** provides a brief summary of Petersen's history, corporate structure, and business operations;

(ii)     **Part II** describes the Debtors' corporate and prepetition capital structure;

(iii)     **Part III** describes the circumstances leading to the commencement of these Chapter 11 Cases; and

(iv)     **Part IV** describes each of the Debtors' First Day Motions.

## I.     <u>Overview of the Debtors and Their Business</u>

### A.  Corporate History

11.     As one of the largest nursing home operators in the United States, Petersen's core mission and focus is to provide critical care to elderly citizens throughout the Midwest.  Founded in 1974 by brothers and registered physical therapists, James D. Petersen and Robert L. Petersen. Owned, operated, and expanded by Robert's son, Mark B. Petersen, Petersen is a family-owned organization that provides various healthcare and rehabilitation services for elderly citizens in Illinois, Missouri, and Iowa in partnership with physicians, skilled nurses, and other health care providers in order to provide assisted and supportive living, skilled nursing care, respite care, memory care, hospice, local medical transportation, radiology, and pharmacy services.

12.     The Company provides quality care that focuses on its residents and in creating strong ties to the local communities it serves.  Petersen serves small rural communities and continues to provide care for Medicaid eligible seniors when many providers would not.  In many cases, Petersen is the largest employer in the respective geographic area and has always emphasized integration into the community and maintaining a strong community presence. Petersen's focus is "caring with a hometown touch."

13.     Petersen began with just two flagship homes in Illinois and grew into a respected and major force in long-term care, with more than 100 Facilities at one time.  In line with its mission, the Company has developed Independent, Supportive and Assisted Living Facilities (each as defined and further described below) that provide worry-free atmospheres for elderly citizens who seek safe and secure living accommodations.  These Facilities have had the added benefit of cultivating growth in the Company's Skilled Nursing Care business segment (defined below).

14.     Having grown up around the original Petersen Facility in Kewanee, Illinois, Mark Petersen became the Chief Executive Officer of the Petersen enterprise in 2002 with the goal of expanding the Company throughout the United States, hoping to provide high quality care to a larger number of communities across the Midwest.

15.     At the helm, Mark Petersen lead the acquisition of a number of Facilities and other properties between with the ultimate goal of converting these properties into future long-term care Facilities for the elderly.  By the end of 2023, the Company, headquartered in Peoria, Illinois, controlled over 90 nursing homes containing over 6,796 beds and had annual operating revenue exceeding $339.7 million.

16.     Petersen employs nearly 4000 employees and is recognized as a major community partner in 43 communities throughout Illinois, eastern Iowa, and Missouri.  The proven business

philosophy of strong community involvement, "bringing the community to the nursing home, and the nursing home to the community," as well as, Petersen's "resident-care based philosophy," is what makes Petersen unique in the industry and is the reason the company is renowned as the Midwest's leading long term care provider.

### B. The Debtors' Operations

17.     Delivering quality and comprehensive care to elderly citizens across the United States remains one of the most critical elements of success in the Company's industry.  Petersen has the unique ability to change as the needs of the community changes.  Using the same proven methods of "caring for those in need," the Company has developed Independent and Assisted Living Centers in communities to care for those requesting a worry-free atmosphere yet still wanting their independence.

18.     Among their many Facilities, the Debtors provide service—sometimes the only available service—to some of the most rural areas of Illinois, Missouri, and Iowa.  Dependable, quality long-term care and brand recognition establishes familiarity with the Company, and an understanding that it is a recognized name in the industry.   To that end, the Company has concentrated on multiple segments of service: (i) Independent Living, (ii) Assisted Living, (iii) Supportive Living, (iv) Skilled Nursing, (v) Memory Care, (vi) Alzheimer's Care and (vii) Rehabilitation Care.

(i)     Independent Living: The Petersen independent living program ("Independent Living") provides unique living arrangements by which residents are able to maintain a sense of independence, privacy and security while still receiving medical and other forms of care and assistance in their daily lives.  For residents who wish to purchase a villa within Petersen's retirements community, the Company has certain properties set aside to be sold to such interested residents.

(ii)     Assisted Living: Petersen's assisted living program ("Assisted Living") combines apartment-style housing with personal care and other services so that residents are afforded the ability to live independently.  Residents have the option to enroll in various care plans depending on their bespoke needs.

(iii)    <u>Supportive Living</u>: Petersen's supportive living program ("<u>Supportive Living</u>") serves to bridge the gap between Independent Living and Assisted Living and is aimed at those residents who require more traditional nursing home care. Supportive Living provides staff to meet various needs of its residents, including assistance with showering and dressing, moving around the community, incontinence care, dementia orientation and support, and daily nursing assessments and monitoring.

(iv)    <u>Skilled Nursing Care</u>:  At each of its sites, Petersen retains on-site, highly educated and above-average skilled nurses who assist with meeting an array of health care needs, including rehabilitation, dementia/Alzheimer's care, around-the-clock care and others ("<u>Skilled Nursing Care</u>").

(v)    <u>Memory Care</u>: Introduced in 2015, Petersen provides therapeutic programming, including comprehensive procedures to assure that residents receive activities that promote self-esteem and accomplishment at any level of cognitive ability ("<u>Memory Care</u>").

(vi)    <u>Alzheimer's Care</u>: Petersen offers specialized assistance to accommodate the varying levels of memory and function loss brought on by Alzheimer's ("<u>Alzheimer's Care</u>").

(vii)    <u>Rehabilitation Care</u>: Petersen's rehabilitation segment provides individualized treatment programs designed to serve patients in a various ways, including physical, occupational and speech therapies and treatment and care planning ("<u>Rehabilitation Care</u>").

18.    Petersen also provides care to persons with intellectual and developmental disabilities in two of its Facilities.

19.    In addition to the healthcare enterprise, Mark Petersen launched a separate hotel business in or around 2007.  Partnering with larger hotel chains such as the Candlewood Suites, Holiday Inn & Suites and Country Inn & Suites, the Company owns and operates hotels across the United States, including locations in Monmouth, New Jersey and Peoria, Illinois.  Such entities, being unrelated to the healthcare line of business, remain non-debtors.

II.    **Overview of the Debtors' Corporate and Capital Structure**

A.  **The Debtors' Corporate Structure**

20.    The Debtors are comprised of 141 privately held entities which the Company uses to manage its operations and real estate business segments.   The aforementioned corporate structure is set forth in the attached **Exhibit C**.

B.  **The Debtors' Capital Structure**

21.    The Debtors' prepetition indebtedness structure is complex.  As a result of the large scale of their enterprise throughout rural Illinois, Missouri, and Iowa, the Debtors have numerous secured lenders financing different portions of their geographic footprint, and a complex web of unsecured obligations comprised of vendors and service providers who, in some instances assist only limited Facilities and others which service the entire enterprise.

22.    As of the Petition Date, the Debtors' principal non-operating liabilities are approximately $295,856,565.40 (the "Prepetition Debt"), as summarized in the chart attached hereto as **Exhibit D**.  Further, the Debtors' organizational chart attached as Exhibit C hereto shows which Debtors are obligated under each of the various credit facilities.  A summary of their credit facilities and related security packages (collectively, the "Prepetition Credit Facilities") owed to the Debtors' various lenders (collectively, the "Prepetition Lenders") is immediately below:

ii.  **Sector Facility**

18.    As of March 23, 2020, certain Debtors, as borrowers,[4] are a party to that certain term loan credit agreement (as amended, restated, and otherwise modified from time to time, the "Sector Loan Agreement") with Column Financial, Inc. ("Column") as successor in interest to Sector Financial Inc., as administrative agent on behalf of certain lenders (the "Sector Lenders"),

---

[4] A full list of the Debtor entities party to this agreement is attached hereto as **Exhibit D**.

providing for a senior secured term loan facility in the original principal amount of $88,757,000 (the "Sector Facility").

19.     The respective Debtors' obligations under the Sector Facility are guaranteed by Petersen Health Care, Inc., Mark Petersen, and certain other Debtor entities as set forth in **Exhibit D**.  Pursuant to the Sector Loan Agreement and certain security agreement, collateral pledge agreements, mortgages, assignments of leases and rents, and fixture filings of the respective Debtors, the respective Debtors' obligations under the Sector Facility are secured in certain collateral, including real property, rents and deposit accounts of certain of the respective Debtors' Facilities.

20.     As part of the Company's quest for additional liquidity in the Fall of 2023, and execution of the eCapital Facility (defined below), Column, on behalf of the lenders party to the Sector Loan Agreement, entered into that certain Intercreditor Agreement, dated as of October 4, 2023 (the "eCapital Intercreditor Agreement") with eCapital Healthcare Corp. ("eCapital").  The eCapital Intercreditor Agreement provides, among other things, that eCapital, as the AR Lender thereunder shall have a priority interest in the AR Lender Priority Collateral (as such terms are defined in the eCapital Intercreditor Agreement) ahead of Column.

21.     On December 19, 2023, Column and the Sector Lenders sent a notice of default under the Sector Facility.  On January 9, 2024, Column sent a further notice of default under the Sector Facility and reservation of rights.  As of the Petition Date, approximately $64,605,074 is outstanding under the Sector Facility.

### iii.  GMF Facility

22.     Certain of the Debtor entities, as borrowers,[5] are party to that certain term loan agreement, dated March 23, 2020 (as amended, restated, and/or modified from time to time, the "GMF Loan Agreement") with GMF Petersen Note LLC as administrative agent and collateral agent and the lender parties thereto (the "GMF Facility").  The Debtors' obligations under the GMF Facility are guaranteed by Petersen Health Care, Inc., Mark Petersen and certain other Debtor entities.  Pursuant to the GMF Loan Agreement and certain security agreement, collateral pledge agreements, mortgages, deeds of trusts, registration statements, fixture filings, and intercreditor agreement, the Debtors' obligations and the related guarantees under the GMF Facility are secured—and structurally subordinate to the Sector Facility as to all relevant Debtor-borrowers except for Betty's Garden RE, LLC and Betty's Garden HCO, LLC—by certain real and personal property of the subject Debtor-borrowers.

23.     As of the Petition Date, approximately $26,400,303 is outstanding under the GMF Facility.

### iv.  eCapital Facility

24.     On October 4, 2023, certain of the Debtor entities, as borrowers,[6] entered into that certain credit and security agreement with eCapital Healthcare Corp., as lender, providing for a revolving credit facility in the maximum principal amount of $12 million (the "eCapital Facility").

---

[5]     A full list of the Debtor entities party to this agreement is attached hereto as **Exhibit D**.

[6]     A full list of the Debtor entities party to this agreement is attached hereto as **Exhibit D**.

As of the Petition Date, approximately $4.5 million is outstanding under the eCapital Facility.  The eCapital Facility will mature on November 1, 2026.

25.     The eCapital Facility is guaranteed Petersen Healthcare, Inc., and certain other Debtor entities.  The eCapital Facility is secured by a first priority security interest on all accounts, revenues and "Related Properties" (as defined therein), deposit accounts (including "Governmental Deposit Accounts" as defined therein), all books and records, and all personal property of each grantor, subject to the eCapital Intercreditor Agreement.

### iii. X-Caliber Facility.

23.     Certain Debtor and non-debtor entities, as borrowers,[7] are party to that certain Loan Agreement, dated October 31, 2019 (the "X-Caliber Loan Agreement") with XCAL 2019-IL-1 Mortgage Trust, as lender ("X-Caliber") (as amended, restated, supplemented, or modified and together with any security documents or agreements ancillary thereto, the "X-Caliber Facility").  The Debtors' obligations under the X-Caliber Term Loan Facility are guaranteed by Petersen Health Care X, LLC, Petersen Health Network LLC, and Mark B. Petersen.  Pursuant to the X-Caliber Term Loan Agreement and certain mortgages, assignments of leases and rents, and deposit account control agreements of the Debtors party thereto, the Debtors' obligations under the X-Caliber Term Loan Facility are secured in certain collateral, including real property, rents and deposit accounts of certain of the Debtors' Facilities.  On December 29, 2023, X-Caliber sent a

---

[7]     Debtors El Paso HCC, LLC, Flanagan HCC, LLC, Kewanee AL, LLC, Knoxville AL, LLC, Legacy Estates AL, LLC, Marigold HCC LLC, Monmouth AL LLC, Polo LLC, El Paso HCO, LLC, Flanagan HCO, LLC, CYE Kewanee HCO, LLC, CYE Knoxville HCO, LLC, Legacy HCO, LLC, Marigold HCO, LLC, CYE Monmouth HCO LLC and Polo HCO, LLC (collectively, the "X-Cal Debtors") together with non-Debtors Charleston HCC, LLC, Cumberland HCC, LLC, Charleston HCO, LLC and Cumberland HCO, LLC entered into the X-Caliber Loan Agreement (as defined herein).  X-Caliber Capital LLC is also lender to non-debtors (A) Charleston HCC, LLC and Charleston HCO, LLC and (B) Cumberland HCC, LLC and Cumberland HCO, LLC, under respective HUD-insured loans.  is the lender to five (5) Debtors under five (5) respective HUD-insured loans.  On February 1, 2024, X-Caliber sent notices of default to the aforementioned non-debtors under their respective HUD-insured facility.

notice of default and acceleration, alleging that $34,486,930.31, plus interest, fees, and costs was outstanding under the X-Caliber Facility.

### v.   Local Bank Loans

26.     Certain Debtor and non-debtor entities, as borrowers, are party to loan facilities with local banks as to their respective facility, as follows:

a)   *Bank of Farmington* – Debtor Petersen Health Systems, Inc. is the borrower under a certain loan facility with Bank of Farmington, as lender ("Farmington Facility") secured by a mortgage and assignment of rents pertaining to the Courtyard Estates of Farmington healthcare Facility.  Mark Petersen personally guarantees the obligations under the Farmington Facility.  The Farmington Facility will mature on April 1, 2047. As of the Petition Date, approximately $2,845,278 in principal amount is outstanding under the Farmington Facility.

b)   *Bank of Rantoul* – Debtor Petersen Health Systems, Inc. is the borrower under a certain loan facility with Bank of Rantoul, as lender ("Rantoul Facility") secured by a mortgage and assignment of rents pertaining to the Courtyard Estates of Herscher healthcare Facility. Mark Petersen personally guarantees the obligations under the Rantoul Facility.  The Rantoul Facility will mature on June 1, 2027. As of the Petition Date, approximately $2,352,907 in principal amount is outstanding under the Rantoul Facility.

c)   *Community State Bank* – Debtor Petersen Health Systems, Inc. is the borrower under that certain loan facility with Community State Bank, as lender ("CSB Facility") secured by a mortgage and assignment of rents pertaining to the Courtyard Estates of Galva and Courtyard Estates of Green Valley healthcare Facilities.  Mark Petersen personally guarantees the obligations under the CSB Facility.  The CSB Facility will mature on

September 1, 2027.  As of the Petition Date, approximately $2,494,108 in principal amount is outstanding under the CSB Facility.

d) *Hickory Point Bank* – Debtor CYE Girard HCO, LLC is the borrower under that certain loan facility with Hickory Point Bank, as lender ("Hickory Facility") secured by a mortgage and assignment of rents pertaining to the Courtyard Estates of Girard healthcare Facility.  Mark Petersen personally guarantees the obligations under the Hickory Facility. The Hickory Facility will mature on August 2, 2026.  As of the Petition Date, approximately $1,839,599 in principal amount is outstanding under the Hickory Facility.

e) *Solutions Bank* – Debtor Petersen Health Care, Inc. is the borrower under a certain loan facility with Solutions Bank, as lender ("Solutions Facility") secured by a mortgage and assignment of rents pertaining to the Courtyard Estates of Canton healthcare Facility.  Mark Petersen personally guarantees the obligations under the Solutions Facility.  The Solutions Facility will mature on September 8, 2037. As of the Petition Date, approximately $3,408,171 in principal amount is outstanding under the Solutions Facility.

### vi.  HUD Loans

18.    The Debtors estimate that they owe approximately $45,732,300 under certain healthcare facility loans insured by the United States Department of Housing and Urban Development ("HUD"), between various Debtor entities and lender parties thereto.

19.    *Berkadia* – Berkadia Commercial Mortgage LLC ("Berkadia") is the lender to two Debtors under their respective HUD-insured loans: Petersen Health Care – Illini, LLC and Petersen Roseville, LLC.  As of the Petition Date, approximately $2,936,067 in principal amount is outstanding under the two loans from Berkadia.

20.  *Capital Funding* – Capital Funding, LLC ("Capital Funding") is the lender to nine

(9) non-debtors under nine (9) respective HUD-insured notes, each dated September 1, 2014.  On

January 21, 2024, Capital Funding sent notices of default under the respective facility (collectively,

the "Capital Funding Facilities") for the following non-debtors, in the principal amounts as shown:

| Debtor | Original Principal Amount | Estimated Amount Outstanding |
|---|---|---|
| Batavia, LLC | $1,123,000.00 | $770,049.00 |
| Benton HCC, LLC | $2,927,000.00 | $1,870,150.00 |
| Bloomington, LLC | $2,019,400.00 | $1,384,717.00 |
| Cisne, LLC | $1,118,500.00 | $714,595.00 |
| Eastside, LLC | $5,298,000.00 | $4,008,467.00 |
| Fondulac, LLC | $2,799,500.00 | $1,919,431.00 |
| Ozark HCC, LLC | $4,159,500.00 | $3,357,885.00 |
| Sunset HCC, LLC | $4,222,400.00 | $1,929,854.00 |
| Timbercreek HCC, LLC | $4,222,400.00 | $3,408,663.00 |

21.  *Grandbridge* – Grandbridge Real Estate Capital LLC, as successor in interest to

Pillar Capital Finance LLC ("Grandbridge"), is the lender to three (3) Debtors under three (3)

respective HUD-insured loans.  On January 30, 2024, Grandbridge sent notices of default under

the respective facility for the following non-debtors, in the principal amounts as shown:

| Debtors | Original Principal Amount | Estimated Amount Outstanding |
|---|---|---|
| South Elgin, LLC<br>Petersen Health Properties, LLC | $5,440.000.00 | $4,617,117.00 |
| Jonesboro, LLC<br>Petersen Health Properties, LLC | $2,880,000.00 | $2,456,269.00 |
| Macomb, LLC<br>Petersen Health Properties, LLC | $2,160,000.00 | $1,833,267.00 |

22.  *Lument* – Lument Real Estate Capital, LLC, as successor in interest to Lancaster

Pollard Mortgage Company ("Lument"), is the lender to five (5) Debtors under five (5) respective

HUD-insured loans.  On February 5, 2024, Lument sent notices of default to the following Debtors

as to their respective HUD loans asserting the following amounts outstanding:

| Debtor | Original Principal Amount | Estimated Amount Outstanding |
|---|---:|---|
| Petersen 23, LLC | $4,673,000.00 | $3,378,956.24 |
| Petersen 26, LLC | $3,824,000.00 | $2,765,060.46 |
| Petersen 27, LLC | $5,727,000.00 | $3,812,081.97 |
| Petersen 29, LLC | $2,146,000.00 | $1,467,399.58 |
| Petersen 30, LLC | $2,497,000.00 | $1,805,532.27 |

23.     *Wells Fargo* – Wells Fargo Bank, N.A. ("Wells Fargo") services a loan to Debtor SJL Health Systems, Inc. related to the Prairie Rose Facility.   As of the Petition Date, approximately $1,455,631 in principal is outstanding on the Wells Fargo loan.  On January 3, 2024, Wells Fargo sent a notice of default to Debtor SJL Health Systems Inc.

24.     *X-Caliber* – X-Caliber Capital LLC ("X-Caliber Capital") is the lender to two non-debtors under two respective HUD-insured loans, Charleston HCC, LLC and Cumberland HCC, LLC.  On February 1, 2024, X-Caliber Capital sent notices of default under the respective facility for the aforementioned two non-debtors (the "X-Caliber HUD Facilities").

### vii. Other Secured Debts

25.     As will be described in further detail in the Debtors' schedules of assets and liabilities, the Debtors estimate that they owe $981,233.00 of additional secured indebtedness, including or arising from, without limitation, automobile loans, equipment liens, tax liens, and other judgment liens.

### viii.        Unsecured Obligations

18.        As of the Petition Date, the Debtors estimate that there is approximately $130.5 million of unsecured indebtedness outstanding against the estates, including trade payables, tax obligations, potential litigation judgments,[8] and amounts owed to former and current employees.

19.        As of the Petition Date, the Debtors had approximately $1,136,566.87 of unrestricted cash on their balance sheet.

### III.        Events Leading to the Commencement of These Chapter 11 Cases.

20.        Petersen is a company comprised of a number of small businesses, all attempting to succeed in small communities all over Illinois, in parts of Missouri and Iowa.  The Midwest is a difficult area for nursing home operators to succeed due to, among other things, the immense need for support in rural areas with little additional support beyond that of the Medicaid and Medicare systems.

21.        As a result of the downward market pressures and trends in the elder care space, inflationary pressures from food, drugs and medical supplies, difficulty recruiting experienced staff, and lingering effects of COVID-19, the Debtors faced liquidity issues and subsequently fell into default with their various credit facilities.  Given the Debtors' need to continue providing care to their residents, the Debtors, in consultation with their advisors, deemed it necessary to forego principal and interest payments owed to their lenders and ensure that critical resident care continue.  Any lapse in operation, no matter how transitory, would have a devastating impact on the Debtors' resident care (thereby becoming a public health concern) and also on the going concern value of the Debtors' business.  As these defaults mounted, receivership cases were filed, and the Debtors'

---

[8]        Such figure excludes any litigation—threatened or pending—that has yet to reach judgment.

liquidity issues worsened.  The filing of these Chapter 11 Cases became necessary after the Debtors' existing lenders declined to provide additional financing.

### A.  Illinois Budget Impasse

22.     As a result of significant financial, political, and other pressures, from approximately July 1, 2015, to August 31, 2017, the state of Illinois failed to pass a budget.  The impasse that left Illinois without a fully appropriated budget for more than two years was the longest standstill of its kind in the state's history.  As a result, many state commitments, including provision of Medicaid reimbursement, remained insufficiently appropriated, creating uncertainty in payments for many reliant on state support.

23.     This impasse created a structural backlog of state payment of Medicaid to service providers of approximately $16.7 billion by November of 2017.[9]  Greatly impacted by the payment backlog were service providers like the Debtor entities.  During this period, the Debtor had to rely on various cash management tools—including increasing working capital liabilities and taking on short-term debt—in order to continue to provide services without displacing residents.  Such increased obligations, paired with a depressed income stream, initiated the Debtors struggle to maintain an otherwise thriving business.

### B.  Market Pressures Occurring Prior to COVID-19 Pandemic

24.     Despite significant success in the face of such trends, the Debtors have also suffered from the decade-long market downward shift away in the nursing home/skilled nursing space.

---

[9]     *See* Illinois State Comptroller Report, *Consequence of Illinois' 2015 -2017 Budget Impasse*, available at https://illinoiscomptroller.gov/special-fiscal/consequences-of-illinois-2015-2017-budget-impasse-and-fiscal-outlook (Sept. 18, 2018).

25.     From 2015-2019 alone, more than 550 nursing homes closed in the United States.[10] Occupancy rates have decreased over time.  Despite nursing homes closing all over the country, the national average occupancy rate decreased by 1.9 percentage points from 2015-2019.[11] Notably, the quality ratings of these closing Facilities have no bearing on the decrease in occupancy.[12]

26.     The dramatic downward shift is due to a trend over the past decade to favor home- and community-based services over those of a formal nursing home.  Naturally, Medicaid dollars have followed the trend, having been allocated at a higher percentage each year to such non-nursing home service providers.[13]  Thus, Medicaid's decreasing reimbursement rates created a crisis for the Debtors and others in the elder care space even before COVID-19 hit.

**C.  COVID-19 Pandemic.**

27.     In addition to the overall market trends, the COVID-19 pandemic put added financial stress on Petersen's long-term care Facilities.  Like many other healthcare entities, the Company had to navigate the risks and hardships associated with the COVID-19 pandemic over since early spring 2020.  COVID-19 caused several direct stresses to the Company's long-term Facilities.  Particularly in the health care industry, the height of the pandemic was marked by high mortality rates, specifically within the elderly community, unclear clinical protocols and unknown infection risk, all of which placed significant stress of the skilled nurses and other employees at

---

[10]     Flinn B. Nursing facility closures and trends June 2015- June 2019. Leading Age. Published February, 2020. Accessed           March           15,           2024.           https://leadingage.org/wp-content/uploads/drupal/Nursing%20Home%20Closures%20and%20Trends.pdf

[11]     *See id.*

[12]     *See id.* (noting that more than 40% of nursing homes that closed has a 4 or 5 star rating).

[13]     Kelly Hughes, Zhanlian Feng, Qinghua Li, Micah Segelman, Iara Oliveira, Judith Goldberg Dey, Rates of nursing home closures were relatively stable over the past decade, but warrant continuous monitoring, *Health Affairs Scholar*, Volume 1, Issue 2, August 2023, qxad025, https://doi.org/10.1093/haschl/qxad025.

the long-term care Facilities.  Additionally, the Company was faced with persistent challenges such as staff shortage, especially among its skilled nurses who preferred work outside of the elder care Facilities in an effort to reduce risk of exposure to COVID-19, which lead to expanded duties for direct care workers, and lack of personal protective equipment.

**D.  Labor Costs and Inflationary Pressures**.

28.    As a result of the COVID-19 pandemic, and even before, the industry was subject to a nationwide health labor shortage which directly affected several healthcare service sectors – including the long-term care services provided by the Company.  Consequently, the Company faced significant upward pressure on the salaries of health care workers, coupled with general inflationary pressure that increased the cost of equipment and other supplies necessary to run the Company's long-term Facilities.  Although overall inflationary pressures have eased, the market for physicians and skilled nurses continues to be extremely competitive.

**E.  Data Breach.**

29.    On or about October 20, 2023, Petersen became the victim of a ransomware attack by an entity named White Ninja.  The attackers infiltrated many of the Petersen systems, thereby impacting the Debtors' access to historic and current billing records, other books and records, and emails.  The Debtors quickly contacted a consultant to assist in remedying the impact of the ransomware attack, and provided notice of the attack to the Federal Bureau of Investigation.  While the Debtors are back "online" with new servers, email addresses, and replacement software, a significant amount of the Debtors' books and records were lost in the attack, leading to incredible

difficulty and delay in pursuit of the Debtors' accounts receivable, which is a crucial part of the Debtors' income.[14]

### F.  Change Healthcare Cyberattack.

30.     The Debtors' liquidity crisis was further hampered by a cyberattack that impacted a crucial service provider for certain of its payors' revenue processes.  It was recently announced that on February 21, 2024, Change Healthcare, a division of UnitedHealth Group, began experiencing a cyber security issue which impacted its operations (the "Change Cyberattack").  Based on media reports regarding the Change Cyberattack, I understand that Change Healthcare processes 15 billion health care transactions annually and is involved in one in every three patient records nationwide.  After the Change Cyberattack was reported in the media, the Debtors noticed reimbursements from certain payors slowing and subsequently heard affirmatively from payors that amounts owed to the Debtors were being suspended due to the Change Cyberattack.  While the Debtors continue to assess the impact of the Change Cyberattack, there is no question it has had a material impact on the Debtors' liquidity profile.

### G.  Receiverships

31.     Amidst the Debtors intended restructuring and after the ransomware attack, three receivership proceedings were commenced against certain Debtors and non-debtor affiliates.  Michael F. Flanagan (the "Receiver") was appointed as the receiver in all three receiverships.  A short recitation of the three receiverships is set forth below.

---

[14]     Additionally, as a result of the ransomware attack, retrieval of the Debtors' files and related information has proven onerous and, in some cases, impossible.  Thus, throughout the Chapter 11 Cases, the Debtors have had and anticipate having difficulty providing comprehensive historical information.

a. *El Paso et al.* **Receivership.**

32.     As noted above, on December 29, 2023, X-Caliber notified the respective Debtors[15] that an Event of Default had occurred under the X-Caliber Bridge Facility (as Event of Default is defined therein) and accelerated the underlying loans.   At the time of the notice, X-Caliber indicated that $34,486,093.91, plus fees, costs, and interest, was due and owing under the X-Caliber Facility.

33.     On January 23, 2024, X-Caliber commenced an action by filing a Verified Complaint in the United States District Court for the Northern District of Illinois, Rockford Division (the "*El Paso et al.* Court") against Debtors owning and/or operating the Facilities known as the Courtyard Estates of Kewanee, Courtyard Estates of Knoxville, Courtyard Estates of Monmouth, El Paso Health Care Center, Flanagan Rehabilitation & Health Care Center, Legacy Estates of Monmouth, Marigold Rehabilitation & Health Care Center, Polo Rehabilitation & Health Care Center (collectively, the "*El Paso et al.* Facilities"),[16] asserting claims for breach of contract, foreclosure of their respective mortgages, and UCC lien enforcement as to rents due thereunder.   Such action is fashioned *X-Caliber Funding LLC v. El Paso HCC, LLC, et al.* (Case No. 3:24-cv-50034) (N.D. Ill.) (the "*El Paso et al.* Receivership Case").   With the Verified Complaint, X-Caliber filed an emergency motion for the appointment of a receiver.  *See* 3:24-cv-50034, Dkt. 5.

---

[15]     See, infra, n. 16.

[16]     Debtor-defendants to the this action are El Paso HCC, LLC, Flanagan HCC, LLC, Kewanee AL, LLC, Knoxville AL, LLC, Legacy Estates AL, LLC, Marigold HCC LLC, Monmouth AL LLC, Polo LLC, El Paso HCO, LLC, Flanagan HCO, LLC, CYE Kewanee HCO, LLC, CYE Knoxville HCO, LLC, Legacy HCO, LLC, Marigold HCO, LLC, CYE Monmouth HCO LLC, and Polo HCO, LLC.

34.     On January 25, 2024, the *El Paso et al.* Court appointed Michael F. Flanagan as receiver (the "Receiver") over the assets that comprise the *El Paso et al.* Facilities. *See* 3:24-cv-50034, Dkt. 8.

### b. Capital Funding Receivership.

35.     As noted above, on January 21, 2024, Capital Funding notified their non-debtor obligors[17] that an Event of Default had occurred under the various Capital Funding Facilities (as Event of Default is defined in the respective documents) and accelerated the underlying loans.

36.     On January 31, 2024, Capital Funding commenced an action by filing a Verified Complaint in the United States District Court for the Northern District of Illinois, Eastern Division (the "*Batavia et al.* Court") against non-debtor affilates owning and/or operating the Facilities known as the Batavia Rehabilitation & Health Care Center, Benton Rehabilitation & Health Care Center, Bloomington Rehabilitation & Health Care Center, Cisne Rehabilitation & Health Care Center, Eastside Health & Rehabilitation Care Center, Fondulac Rehabilitation & Health Care Center, Ozark Rehabilitation & Health Care Center, Timbercreek Rehab & Health Care Center, and Sunset Rehabilitation & Health Care Center (collectively, the "*Batavia et al.* Facilities"),[18] asserting claims for breach of contract, foreclosure of their respective mortgages, and UCC lien enforcement as to rents due thereunder.  Such action is fashioned *Capital Funding, LLC v. Batavia, LLC, et al.* (Case No. 1:24-cv-00888) (N.D. Ill.) (the "*Batavia et al.* Receivership Case").  With the Verified Complaint, Capital Funding filed an emergency motion for the appointment of a receiver.  *See* 1:24-cv-00888, Dkt. 5.

---

[17]     *See*, *infra*, n. 18.

[18]     Non-Debtor defendants to this action are Batavia, LLC, Timbercreek HCC, LLC, Fondulac, LLC, Bloomington, LLC, Sunset HCC, LLC, Eastside, LLC, Cisne, LLC, Benton HCC, LLC, Ozark HCC, LLC, Petersen Health Junction, LLC, Petersen Health Operations, LLC, and Petersen MT2, LLC.

37.     On February 8, 2024, the *Batavia et al.* Court appointed the Receiver over the assets that comprise the *Batavia et al.* Facilities.  *See* 1:24-cv-00888, Dkt. 15.

### c. X-Caliber Second Receivership.

38.     As noted above, on February 1, 2024, X-Caliber Capital notified their non-debtor obligors[19] that an Event of Default had occurred under the various X-Caliber HUD Facilities (as Event of Default is defined in the respective documents) and accelerated the underlying loans.

39.     On February 6, 2024, X-Caliber Capital commenced an action by filing a Verified Complaint in the United States District Court for the Central District of Illinois, Urbana Division (the "*Charleston et al.* Court") against non-debtor affiliates owning and/or operating the Facilities known as the Charleston Rehabilitation & Health Care, Cumberland Rehabilitation & Health Care (collectively, the "*Charleston et al.* Facilities"),[20] asserting claims for breach of contract, foreclosure of their respective mortgages, and UCC lien enforcement as to rents due thereunder. Such action is fashioned *X-Caliber Capital LLC v. Charleston HCC, LLC, et al.* (Case No. 2:24-cv-02034) (N.D. Ill.) (the "*Charleston et al.* Receivership Case").  With the Verified Complaint, X-Caliber Capital filed an emergency motion for the appointment of a receiver.  *See* 2:24-cv-02034, Dkt. 4.

40.     On February 13, 2024, the *Charleston et al.* Court appointed the Receiver over the assets that comprise the *Charleston et al.* Facilities. *See* 2:24-cv-02034, Dkt. 13.

41.     The aforementioned receiverships (the "Receiverships") have caused significant hardship for the Company, diverting focus from the restructuring of the Debtors' obligations and

---

[19]     *See*, *infra*, n. 20.

[20]     Non-Debtor defendants to this action are Batavia, LLC, Timbercreek HCC, LLC, Fondulac, LLC, Bloomington, LLC, Sunset HCC, LLC, Eastside, LLC, Cisne, LLC, Benton HCC, LLC, Ozark HCC, LLC, Petersen Health Junction, LLC, Petersen Health Operations, LLC, and Petersen MT2, LLC.

right-sizing of their balance sheets in order to fulfil demand-after-demand from the Receiver or his professionals, and fielding various issues that have arisen through the transition in care from the Petersen enterprise to the Receiver.  Thus, among other reasons, by the filing of these Chapter 11 Cases and relief sought in the First Day Motions described herein, the Debtors seek relief from the Court to ensure proper care is provided to all residents in the Debtors' Facilities and properly prepare the enterprise for the next steps in the restructuring of their estate.

### H.  Proactive Response and DIP Loan Negotiations.

42.     Prior to the Receiverships, when it became apparent that a restructuring of the Debtors' obligations was necessary, the Debtors, with the aid of Getzler Henrich, and their proposed bankruptcy counsel, Winston & Strawn LLP ("Winston"), began the process of identifying potential providers of financing, whether as part of a refinancing out of court or post-petition financing.  As is described in more detail in the *Declaration of Luke Andrews in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Secured Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Authorizing the Non-Consensual use of Cash Collateral, (IV) Granting Adequate Protection, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Andrews Declaration"), filed concurrently with the DIP Motion (defined and described below), obtaining financing in these Chapter 11 Cases is complicated by the sheer number of the Debtors' prepetition secured lenders.  The Debtors own a large pool of assets with many different secured lenders, and none expressed any interest or desire in providing funding, particularly to finance potential chapter 11 cases outside each lender's own prepetition collateral pool.  Thus, even were it possible to obtain financing from the Debtors' many prepetition lenders, negotiating

a separate DIP with every prepetition secured lender, or even with the largest prepetition secured lenders, would have been extremely inefficient and burdensome.

43.     While the Debtors' professionals requested financing proposals from the Debtors' existing lenders, none were received.  Concurrently, the Debtors solicited proposals for financing from 27 potential DIP lenders.  Five potential DIP lenders provided term sheets and the Debtors ultimately negotiated with two potential lenders to improve the terms, ultimately determining to accept the arrangement with JMB Capital Partners Lending, LLC.  Details regarding those terms and other details as to the process are set forth further in the Andrews Declaration, and my further declaration in support of the DIP Motion.

44.     As a result of the foregoing developments, the Debtors have filed (a) the Petitions and (b) the First Day Motions relating to relief needed in connection with these bankruptcy filings.

45.     The Debtors intend to maintain their operations, to the extent possible, on a "business as usual" basis during the pendency of these Chapter 11 Cases.  Ultimately, through these Chapter 11 Cases, the Debtors intend to use the benefits of the bankruptcy process to pursue an orderly sale of its assets in a manner designed to maximize value of the Debtors' estates and confirm a plan providing for the orderly resolution of the Debtors' estates.  The Debtors believe the filing of their bankruptcy petitions, the relief the Debtors request in their First Day Pleadings and the availability of post-petition financing will aid the Debtors' operations and assuage the fears of their vendors and customers regarding the Debtors' ongoing operations and any transitions in a sale process or sales processes.

## IV.     The First Day Motions.

46.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions in these Chapter 11 Cases seeking various forms of relief intended to stabilize the Debtors'

business operations and facilitate the efficient administration of these Chapter 11 Cases.  I have reviewed each First Day Motion (including the exhibits and schedules attached thereto), and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.  I believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' businesses.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each First Day Motion.  That testimony would establish that the failure to receive the relief requested by the First Day Motions would have a deleterious effect on the Debtors' operations and value, and cause immediate and irreparable harm to the estates.

47.     The First Day Motions seek authority to, among other things, obtain debtor-in-possession financing and use cash collateral on an interim basis, honor employee-related wage and benefits obligations, pay certain critical prepetition accounts payable claims, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is also necessary to enable the Debtors to transition into Chapter 11 in a manner that avoids substantial disruption to the Debtors' operations and will preserve the value of the Debtors' enterprise for the benefit of all parties in interest.

I.     **ADMINISTRATIVE MOTIONS**

**Debtors' Motion for an Order Authorizing Joint Administration of Their Chapter 11 Cases Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 (the "Joint Administration Motion")**

48.     In the Joint Administration Motion, the Debtors seek entry of an order (i) authorizing and directing the joint administration of the Debtors' chapter 11 cases (collectively,

the "Chapter 11 Cases") and the consolidation thereof for procedural purposes only, and (ii) granting certain related relief.

49.     The Debtors' operations are largely integrated, and various Debtors play a role in other Debtors' capital structures through intercompany transactions.

50.     Many of the motions, applications, hearings and orders that will arise in these Chapter 11 Cases will jointly affect all of the Debtors.  For this reason, I believe that the interests of the Debtors, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 Cases for procedural purposes only, under the case number assigned to Debtor, SC Healthcare Holding, LLC (the "Lead Case").  Because these Chapter 11 Cases involve 141 Debtors, I understand that joint administration will significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays. Moreover, joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings, objections, and hearings, and will also allow the United States Trustee (the "U.S. Trustee") and all parties in interest to monitor these Chapter 11 Cases with greater ease and efficiency.  I believe that the joint administration of these cases will not prejudice or adversely affect the rights of the Debtors' creditors because the relief sought herein is purely procedural and is not intended to affect any substantive rights.

51.     For these reasons, I believe, and the Debtors submit, that the relief requested in the Joint Administration Motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

**Debtors' Motion for an Order Authorizing the Debtors to File a Consolidated Master List of Creditors, File a Consolidated Top 40 General Unsecured Creditors List, Authorizing the Redaction of Personally Identifiable Information and to Maintain and Protect Confidential Resident Information (the "<u>Creditor Matrix Motion</u>")**

52.     The Debtors request entry of an order (i) authorizing the Debtors to file (a) the Consolidated Creditor Matrix in lieu of separate mailing matrices for each Debtor and (b) the Consolidated Top 40 List in lieu of separate lists for each Debtor; (ii)  authorizing the Debtors to redact certain personally identifiable information for the Debtors' current and former employees, independent contractors, vendors, and clients; (iii) authorizing the implementation of procedures to protect confidential information of the Residents; and (iv) granting related relief.

53.     *Single Creditor Matrix* – The Debtors do not presently maintain lists of the names and addresses of all their creditors on a Debtor-specific basis.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and may result in duplicate mailings.  Further, the Debtors have hundreds of creditors, employees, and other parties-in-interest that will be provided with notice of the Chapter 11 Cases.  This task would be especially burdensome given the demands on the Debtors' staff resulting from the Chapter 11 Cases.  The Debtors submit that permitting them to maintain a single, consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, is warranted.  In addition, if the Debtors' request to retain KCC as Claims and Noticing Agent (as defined below) is granted, KCC will, among other things, complete the mailing of the applicable notices to the parties in the Consolidated Creditor Matrix.  The Debtors believe that filing a Consolidated Creditor Matrix will enable KCC to provide notice efficiently to all entitled parties.

54.     *Consolidated Creditor List* – The Debtors submit that a single, consolidated list of their combined 40 largest general unsecured creditors in the Chapter 11 Cases is more reflective

of the body of unsecured creditors that have the greatest stake in the Chapter 11 Cases.  Indeed, the Debtors' significant unsecured creditors are captured on the Consolidated Top 40 List and such list will provide the U.S. Trustee with a sufficiently clear picture of the Debtors' unsecured creditor constituency.  In addition, the Debtors operate as a single business enterprise and certain Debtors share many creditors.  Therefore, the Debtors respectfully request authorization–to the extent not already authorized under Rule 1007-2(a) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules")– to file a Consolidated Top 40 List.  The Debtors believe that such relief is not only appropriate under the circumstances, but necessary for the efficient and orderly administration of the Chapter 11 Cases.

55. *Redaction of Personally Identifiable Information* –  The Debtors seek authority to redact from any paper filed or to be filed with the Court in the Chapter 11 Cases,[21] including the Consolidated Creditor Matrix and Schedules of Assets and Liabilities and Statements of Financial Affairs, the home addresses (and, where applicable, email addresses) of individual creditors— including the Debtors' current and former employees, independent contractors, vendors, and clients—because such information can be used to perpetrate identity theft and electronic mail scams or locate survivors of domestic violence, harassment, or stalking.

56. *Protection of Residents' Confidentiality* – More than that, in the ordinary course of business, the Debtors have access to, and receive, "protected health information" and data relating to the Residents, which the Debtors are required to maintain on a confidential basis pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").  In an effort to comply with HIPAA and bankruptcy reporting requirements, the Debtors propose the following procedures

---

[21]     By this First Day Motion, the Debtors also seek authority to redact such information from certificates of service.

to maintain the Residents' confidentiality during the pendency of the Chapter 11 Cases (the

"Privacy Procedures"):

    a.    The Debtors shall omit any reference to current or former Residents from the Consolidated Creditor Matrix and from any other documents filed in the Chapter 11 Cases, including certificates of service, subject to subsection (d), below;

    b.    The Debtors, with the assistance of their professionals, are authorized to prepare and maintain (i) a separate creditor matrix comprised of the Residents (the "Resident Matrix") and (ii) separate schedules of claims that may be asserted against and by the Residents (the "Resident Schedules") and shall make the confidential Resident Matrix and Resident Schedules, or any portion thereof, available to any party in interest only after the Court has entered an order authorizing the Debtors to do so;

    c.    The Debtors are not required to file the Resident Matrix or the Resident Schedules in the format required by the Local Rules, but are permitted to file a redacted version of the Resident Schedules that redacts the name and address of the Residents and assigns a unique identification number to each of the Residents, provided, however, that the Resident Matrix and the Resident Schedules may be reviewed by (i) the Court; (ii) the U.S. Trustee; and (iii) any other party in interest that obtains an order directing the Debtors to disclose the Resident Matrix and/or Resident Schedules to such party;

    d.    If KCC serves any document upon any person listed on the Resident Matrix, the Claims Agent is authorized to note in the applicable certificate of service that the parties included in such service included individuals listed on the Resident Matrix; and

    e.    To the extent that any Resident discloses his or her own health information in any pleading, proof of claim, notice, or other publicly available document, the Debtors and their professionals shall, and to the extent required by the Bankruptcy Code, Bankruptcy Rules, Local Rules, or any other applicable law, rule, or court other, include protected health information about the Resident in any subsequent pleading, notice, document, list, or other public disclosure made in connection with the Chapter 11 Cases, and such disclosure shall not be deemed to be an "impermissible disclosure" within the meaning of HIPAA or any regulation promulgated thereunder; provided, however, such disclosure by the Debtors shall be only the information disclosed by the respective Resident..

    57.    The Debtors respectfully submit that the Debtors, their estates, and the Residents

will suffer immediate and irreparable harm if the relief requested in this First Day Motion is not

granted.  As described in the Creditor Matrix Motion, the Debtors' obligation to maintain patient confidentiality under HIPAA conflicts with the disclosure requirements otherwise required under the Bankruptcy Code.  Absent the relief requested in the Creditor Matrix Motion, the Debtors may be required to disclose the Residents' confidential information in violation of HIPAA—which may also subject the Residents, all of whom are elderly, to threats of identity theft and other predatory actions—and may be subjected to significant monetary penalties as a result thereof.

58.     Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be approved.

**Application of Debtors for Order Authorizing Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent, Effective as of the Petition Date (the "Claims Agent Retention Motion")**

59.     The Debtors request entry of an order (a) appointing Kurtzman Carson Consultants LLC ("KCC") as the claims and noticing agent (the "Claims and Noticing Agent") for the Debtors and these Chapter 11 Cases, effective as of the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases and (b) granting related relief.  It is my understanding that the Debtors' selection of KCC to act as the Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, in that the Debtors, with the assistance of their advisors, have obtained and reviewed engagement proposals from four other court-approved claims and noticing agents to ensure selection through a competitive process.  The terms of KCC's retention are set forth in the Services Agreement attached to the Claims Agent Retention Motion as Exhibit C; *provided* that KCC is seeking approval solely of the terms and provisions set forth in their application and the proposed order attached thereto.  I submit, based on all engagement proposals obtained and reviewed, that KCC's rates are competitive and reasonable given KCC's quality of services and expertise.

31465251.1

31

60.     Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be well in excess of 5,000 entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of both the Debtors' estates and their creditors.

## II.     <u>OPERATIONS MOTIONS</u>

**Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Use Their Bank Accounts, (B) Honor Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Preform Intercompany Transactions and (II) Granting Related (the "<u>Cash Management Motion</u>")**

61.     Pursuant to the Cash Management Motion, the Debtors' seek interim and final orders (i) authorizing, but not directing, the Debtors to (a) continue to operate their Cash Management System, including maintaining their Bank Accounts, Refund Programs, and Business Forms in accordance with the Interim DIP Order, (b) honor certain prepetition obligations related thereto, and (c) continue to engage in Intercompany Transactions; (ii) granting administrative expense priority status to postpetition Intercompany Claims, which priority shall rank junior to the DIP Liens and the DIP Superpriority Claims; and (iii) granting related relief.

62.     To facilitate the efficient operation of their businesses, Petersen operates a Company-wide accounting and cash concentration and disbursement system (the "<u>Cash Management System</u>") to collect, transfer, and disburse funds generated by its operations.  The Cash Management System has been in place for more than four years and is essential to the stability of the Debtors' assets and business objectives, and to maximizing the value of their estates.

63.     The Cash Management System is vital to the Debtors' ability to conduct their daily operations, including receiving revenue and paying their vendors, employees, and stakeholders. The Cash Management System provides significant benefits to the Debtors including, among other

things, the ability to control corporate funds, to ensure the availability of funds when necessary, and to reduce costs and administrative expenses by facilitating the movement of funds and developing timely and accurate account balance information.

64.     Any disruption to the Cash Management System would have an immediate adverse impact on and cause irreparable harm to the Debtors' businesses and would impair the Debtors' ability to successfully administer these Chapter 11 Cases.  Being forced to change the Cash Management System would be a cumbersome process prone to error and the potential for misdirection of receipts.  It would be time consuming, difficult, and costly for the Debtors to establish an entirely new system of accounts and a new cash management system.  The attendant delays from revising cash management procedures and redirecting receipts would create unnecessary pressure on the Debtors and their employees while they work to meet the other administrative obligations imposed by chapter 11.  The Debtors will maintain records of all transfers within the Cash Management System to the same extent that they were recorded by the Debtors before the Petition Date.  As a result, the Debtors will be able to document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest.

65.     Accordingly, I believe that, to minimize the disruption caused by these Chapter 11 Cases, maximize the value of the Debtors' estates and ensure the seamless operation of the Debtors' businesses and to realize the benefits of the Cash Management System, the Debtors should be allowed to continue using the Cash Management System and should not be required to open new bank accounts to replace currently existing accounts.

**Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "Wages Motion")**

66.     Pursuant to the Wages Motion, the Debtors seek authority to (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share or insurance premiums and taxes), reimbursable expenses, health and welfare benefits, and certain supplemental benefits the Debtors have historically provided to the Employees, as applicable, in the ordinary course of business (collectively, the "Employee Compensation and Benefits"), including all costs incidental to the Employee Compensation and Benefits. The timely payment of workforce-related obligations is necessary for the Debtors to maintain ordinary course operations, continue providing quality patient care, and avoid personal financial hardship to their Employees.

67.     The Debtors employ approximately 3,918 individuals on a full-time or part-time basis (collectively, the "Employees"). Approximately 3,678 Employees are paid on an hourly basis and approximately 240 Employees receive a salary. The Employees are employed at the Debtors' long-term care facilities located in Illinois, Missouri, and Iowa.

68.     The Debtors' ability to provide quality long-term care to their residents depends on the continued service and morale of the Employees. The Employees perform a wide variety of functions critical to the Debtors' operations and the administration of these Chapter 11 Cases. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and the health and safety of residents. The Employees include highly-trained personnel who are not easily replaced. Without the continued, uninterrupted services of the Employees, the care, health, and safety of the residents at the Debtors' Facilities

will be in jeopardy and the Debtors' ability to maintain and administer their estates will be materially impaired.  Indeed, if the relief sought in the Wages Motion is not granted, I believe that the estates would suffer immediate and irreparable harm.

69.    The vast majority of the Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, the Employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their compensation and providing benefits.

70.    The Debtors also regularly utilize the services of temporary workers and third-party clinical practitioners (collectively, the "Third-Party Professionals") who provide a variety of services that are critical to business operations.  The Debtors have historically sourced such Third-Party Professionals from professional-services providers (the "Third-Party Professional Agencies").  As of the Petition Date, there are approximately 218 Third-Party Professionals providing services to the Debtors.  The Debtors make payments to the Third-Party Professional Agencies for services performed in sourcing and compensating Third-Party Professionals.  Generally, the Debtors make payments to the Third-Party Professional Agencies on a weekly, bi-monthly, or monthly basis, and the Third-Party Professional Agencies subsequently pay the Third-Party Professionals for services rendered.

71.    The Third-Party Professional Agencies are invaluable in identifying and engaging qualified Third-Party Professionals.  The authority to continue paying the Third-Party Professional Agency Fees is critical to minimize disruption of the Debtors' continued business operations.

72.    The Company has approximately 68 Medical Directors on premises across their various Facilities (the "Medical Directors").  The Medical Directors perform functions critical to resident care and mandated by certain regulations including but not limited to, implementing

resident care policies and coordinating medical care in the Facilities.  In most instances, the Medical Director employed at the Facilities are the only individuals in the geographic area that can perform the functions required at those Facilities.  Moreover, were such Facilities left without the ability to engage and employ a Medical Director, the Facilities would likely be in violation of certain state regulations and subject to penalties, fines and, ultimately, closure should they be unable to replace a Medical Director.

73.     Medical Directors are compensated in one of three different ways:  (a) as 1099 independent contractors; (b) they have formed a legal entity and that entity is paid as a vendor by the Debtors; or (c) they are employed by a local hospital which has an agreement with the Debtors to provide the Medical Director the a specific Facility to perform the necessary functions and then the Debtors are billed for that service.

74.     The Medical Directors and the Employees are distinctly familiar with the Debtors' array of clinical services, processes and systems and possesses specialized knowledge, skills and experience that cannot be easily replaced.

75.     I believe that the Employees provide the Debtors with services necessary to conduct the Debtors' business such that the success of these Chapter 11 Cases depends on the retention and cooperation of the Debtors' employees.  Any delay or failure to pay the Employee Compensation and Benefits would irreparably impair the employees' morale, dedication, confidence, and cooperation and would adversely impact the Debtors' relationship with their employees.  At this early stage, the Debtors simply cannot risk the substantial damage and potential value destruction to their businesses that would inevitably follow as a result of significant Employee turnover.  Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant cost and efforts—which may not even be possible

given the overhang of these Chapter 11 Cases.  Consequently, it is critical that the Debtors be authorized to satisfy their Employee Compensation and Benefits and continue their ordinary course employee benefits obligations in effect as of the Petition Date.

76.     I believe amounts owed to any individual Employee on account of the Employee Compensation and Benefits are less than $15,150, the priority expense cap set forth by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  To the extent that any employee is owed an amount in excess of $15,150, any amount owed that exceeds the priority expense cap will be treated as an unsecured claim or subject to a further motion filed with the Court.

77.     Accordingly, I believe that payment of all prepetition Employee Compensation and Benefits in accordance with the Debtors' prepetition business practices is a necessary and critical element of the Debtors' efforts to preserve value and will enable the Debtors to retain qualified employees and is in the best interests of the Debtors, their estates and creditors, and all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be approved.

**Motion of Debtors for Order Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Court of Business in Connection with Liability, Property, and Other Insurance Programs, Including Payment of Policy Premiums (the "Insurance Motion")**

78.     In the ordinary course of business, the Debtors maintain numerous insurance coverage through policies (the "Insurance Policies") that are administered by various third-party insurance carriers to protect the Debtors against adverse occurrences.  The Insurance Policies provide coverage for, among other things, property liability, general liability, worker's compensation, and professional liability.  The property and general liability policy, issued by AXA Insurance, identified in the Insurance Motion is partially financed through a Premium Finance Agreement (the "Premium Finance Agreement").  In the ordinary course of business, the Debtors are also required, by the course of business operations, regulations, laws, certain credit agreements,

and contracts that govern the Debtors' commercial activities, to maintain surety bonds (collectively, the "Surety Bonds" and, each, a "Surety Bond") from surety providers (collectively, the "Sureties") to (i) maintain a notary, (ii) guarantee the security of their residents' funds, and (iii) guarantee the provision of utility services.

79.     The Insurance Policies and Surety Bonds are essential to the preservation of the Debtors' businesses, properties, and assets, and in many cases coverage is required by various laws and contracts that govern the Debtors' business conduct.  Accordingly, the Debtors seek entry of an order authorizing the Debtors to continue their prepetition insurance coverage and satisfy related prepetition obligations, renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis, pay prepetition obligations on account of and continue to pay brokerage fees and claims administration fees, and maintain the surety bond program and letters of credit.

80.     The Debtors also retain the services of Kuhl Agency, HUB International, RT Specialty, and CRC Insurance Services Inc. to help manage their portfolios of risk (collectively, the "Brokers").  The Brokers, among other things, assist the Debtors in obtaining comprehensive insurance coverage, including identifying and obtaining Surety Bonds (as defined below), in a cost-effective manner and provide ongoing support throughout each policy period.

81.     To ensure uninterrupted coverage under the Insurance Policies and Surety Bonds, I believe it is essential to pay any amounts owed in connection with the Insurance Policies, Premium Finance Agreement, and Surety Bonds and to continue to honor obligations under the Insurance Policies and Surety Bonds as they come due on a postpetition basis in the ordinary course of business and consistent with past practice.  Any prepetition amounts that the Debtors may pay in respect of the Insurance Policies, Premium Finance Agreement, and Surety Bonds are small in

31465251.1

light of the size of the Debtors' estates and benefits to be derived therefrom. Thus, I submit that the continuation of the Insurance Policies and Surety Bonds and the payment of all prepetition and post-petition obligations relating to the Insurance Policies and Surety Bonds arising thereunder are essential to preserve the Debtors' assets and protect against unknowable losses.

82.    Thus, to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**Debtors' Motion For Interim and Final Orders, Pursuant to Section 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

83.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, water, waste disposal, telecommunications and other similar services (collectively, the "Utility Services") from a number of utility companies or brokers (collectively, the "Utility Providers"). A nonexclusive list of the Utility Providers and their affiliates that provide Utility Services to the Debtors as of the Petition Date is attached to the Utilities Motion as Exhibit C.

84.    On average, the Debtors pay approximately $647,085.06 each month for third-party Utility Services. The Debtors also have five surety bonds outstanding with four Utility Providers, all of which are through Hartford Fire Insurance Company, totaling approximately $522.00 in aggregate annual premiums. The Debtors do not estimate that they have any amounts currently held as security deposits with respect to any remaining Utility Provider.

85.    The Debtors' access to uninterrupted Utility Services is essential to their ongoing operations and to their reorganization efforts. Should a Utility Provider refuse or discontinue

Utility Services, even for a brief period, the Debtors' business operations could be severely disrupted.  If such disruption occurred, the impact on the Debtors' business operations and revenue would be extremely harmful to the health and safety of the Debtors' vulnerable residents and would jeopardize the Debtors' reorganization efforts.  It is therefore critical that the Utility Services continue uninterrupted.

86.     The Debtors intend to pay all undisputed postpetition obligations owed to the Utility Companies in a timely manner, and propose to provide "assurance of payment" to Utility Companies within twenty (20) days after the Petition Date by placing a cash deposit (the "Adequate Assurance Deposit") equal to 50% of the Estimated Utility Expense for each Utility Company (approximately $323,542.53 in the aggregate) into a newly created, segregated account of the Debtors (the "Adequate Assurance Deposit Account") under the Debtors' control for the benefit of any Utility Company, unless any such Utility Company agrees in writing to a lesser amount.  No creditor of any of the Debtors shall have any interest in or lien on the Adequate Assurance Deposit or the Adequate Assurance Deposit Account.  Currently, none of the Debtors' Utility Providers are holding any security deposits.

87.     I believe that separate negotiations with each of the Utility Providers with respect to adequate assurance would be time-consuming and unnecessarily divert the Debtors' personnel from other critical tasks related to the operation of their business and the restructuring.  This is especially true during the first days of these Chapter 11 Cases.  I believe that the Proposed Adequate Assurance sufficiently insures the Utility Providers against any risk of nonpayment for future Utility Services.  Moreover, I believe that the proposed adequate assurance procedures minimize the risk of termination of the Utility Services.  If the Debtors fail to reach early agreement with each Utility Provider, they would have to file motions seeking expedited determinations as to

adequate assurance or risk service termination.  Thus, to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Utilities Motion should be granted.

**Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Prepetition Taxes and Fees in the Ordinary Course of Business, and (B) Granting Related Relief (the "Taxes Motion")**

88.     Pursuant to the Taxes Motion, the Debtors seek entry of an order authorizing the Debtors to pay Taxes and Fees owed to the Taxing Authorities, including those which accrued pre-petition but were not yet due, provided that the aggregate amount of such payments shall not exceed $1,687,597.80, in the aggregate, prior to the entry of a final order.

89.     In the ordinary course of their business, the Debtors collect, incur, remit, withhold, and/or pay various taxes (each, a "Tax" and collectively, the "Taxes") and must pay certain license and/or registration fees (each, a "Fee" and collectively, the "Fees") to various federal, state, and local taxing and regulatory authorities (each, a "Taxing Authority" and collectively, the "Taxing Authorities").

90.     The Debtors also use, in the ordinary course of their business, a third-party service provider, ADP, Inc., ("ADP") to facilitate the payment certain of the Taxes and Fees.  Such services include, amongst others, calculating payroll taxes, collecting payroll taxes from the Debtors during each payroll run, and remitting such payroll taxes to the Taxing Authorities on the Debtors' behalf when due.

91.     The Debtors estimate that, as of the Petition Date, the total amount of prepetition Taxes and Fees currently owed to the Taxing Authorities is approximately $14,483,016.32 in the aggregate.  Additionally, the Debtors estimate that approximately $1,687,597.80 in Taxes and Fees have accrued as of the Petition Date that will become due and owing prior to a final hearing on the Taxes Motion.

92.     Thus, to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and will facilitate the Debtors' ability to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain Critical Vendors and (II) Granting Related Relief (the "Critical Vendors Motion")**

93.     Pursuant to the Critical Vendors Motion, the Debtors seek authority, but not direction, to pay, in the ordinary course of their business, prepetition claims held by certain critical vendors.  In the ordinary course of business, the Debtors make payments to certain essential trade vendors and service providers (collectively, the "Critical Vendors").  If the claims held by the Critical Vendors are not satisfied in the early stages of these cases, their resulting unwillingness to continue to provide inventory and services to the Debtors would, I believe, cause an interruption of the Debtors' businesses, frustrate the Debtors' attempts at reorganization, and jeopardize the Debtors' ability to maintain the safety and health of residents.  The Debtors estimate that they owe approximately $12,870.507.77 to Critical Vendors as of the Petition Date (the "Critical Vendor Claims").

94.     Notably, the Critical Vendors provide goods and services that are essential for the day-to-day operations of the Debtors' Facilities and, consequently, the Debtors' ability to maximize the estates' going concern value, whether through a sale or otherwise.  Those goods and services make it possible for the Debtors to maintain safe and hospitable Facilities wherein the Debtors' residents can receive the care and attention that they need.  Moreover, many of the Debtors' Facilities are located in remote geographic locations where, in certain instances, there is

only one particular Critical Vendor that can provide the goods and/or services required by the Debtors to maintain safe and hospitable Facilities.

95.     The Debtors, in consultation with their advisors, have thoroughly reviewed their business relationships and identified certain vendors, the loss of whose particular goods or services would cause immediate and irreparable harm to the Debtors' estates.   In identifying Critical Vendors, the Debtors, together with their advisors, undertook a comprehensive process to ensure that, among other criteria, only vendors that are necessary to preserve the value of the estates have been designated as Critical Vendors.   In connection therewith, the Debtors generally considered the following criteria:

- whether a particular vendor is a sole source supplier or service provider, including whether the Debtors' selection of a vendor is limited by geography;

- whether the services provided by the vendor are so vital, or the vendors' operations are so commingled with the Debtors' business, that even the briefest disruption would cause significant harm to the Debtors' operations;

- whether the Debtors would be unable to obtain comparable products or services from alternative sources on a cost-effective basis within a reasonable timeframe;

- whether the Debtors' inventory levels or service coverage is sufficient to meet resident demands while an alternative vendor is located;

- whether a vendor meeting the foregoing criteria is able or likely to refuse providing essential products or services to the Debtors if their prepetition balances are not paid;

- whether the business relationship between the Debtors and the supplier is governed by a contract and the relative relationship between the amount owed to the vendor and the costs the Debtors would incur if the vendor ceased performance due to non-payment and the Debtors had to take an enforcement action against the vendor; and

- whether the vendor holds a valid claim under section 503(b)(9) of the Bankruptcy Code.

96.     Applying these criteria, the Debtors examined each of their prepetition vendor relationships to determine which vendors were truly critical to the continued operation of the

Debtors' businesses.  In addition to these factors, the Debtors and their advisors examined the health of each vendor relationship, their familiarity with the chapter 11 process, and the extent to which each vendor's prepetition claims could be satisfied elsewhere in the chapter 11 process.

97.     The Debtors receive certain supplies on an order-by-order basis (and in most cases, without a supply contract).  As of the Petition Date, the Debtors believe that they owe Critical Vendors approximately $451,371.97 on account of goods received by the Debtors within the 20 days immediately prior to the Petition Date (claims related to such goods, the "503(b)(9) Claims").  After closely analyzing the scope of potential 503(b)(9) Claims, the Debtors expect that the majority of the 503(b)(9) Claims will come due prior to a final hearing on Critical Vendor Motion.  The Debtors seek to have Critical Vendors which hold 503(b)(9) Claims apply any postpetition payment received in connection with the Critical Vendor Motion in the first instance against such Critical Vendors' 503(b)(9) Claims(s), in full or in part, as applicable.  The Debtors believe that, to the extent Critical Vendor Claims qualify as 503(b)(9) Claims, in full or in part, payment at the outset of these proceedings will not prejudice the estates, as it merely affects the timing of payment given the need to satisfy such claims in connection with a proposed plan of reorganization or liquidation, whereas non-payment of Critical Vendor Claims which qualify as 503(b)(9) Claims would have a devastating impact on the estates and the Debtors' ability to care for their residents and progress through these Chapter 11 Cases.

98.     Accordingly, in the Critical Vendor Motion, the Debtors request authorization to pay the pre-petition fixed, liquidated, and undisputed claims of Critical Vendors (the "Critical Vendor Claims"), because payment of such claims is necessary to achieve their chapter 11 objectives and preserve value for their various constituencies.

99.     The Debtors will attempt to condition the payment of individual Critical Vendor Claims on the agreement of the Critical Vendor to continue supplying goods and/or services to the Debtors on the same trade terms that, or better trade terms than, such Critical Vendors offered the Debtors immediately prior to the Petition Date or, if more favorable, within the 120 day period prior to the Petition Date, or pursuant to such other trade practices and programs that are favorable to the Debtors.  In the Critical Vendor Motion, the Debtors seek to reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

100.    To prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Critical Vendors Motion—including payment of Critical Vendor Claims—is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Payment of Critical Vendor Claims that arise during the period between the entry of interim and final orders related to the Critical Vendors Motion will be narrowly identified and limited to only those Critical Vendor Claims that arise during that period.  Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendors Motion should be approved.

**Motion For Interim and Final Orders Authorizing the Debtors to Obtain Senior Secured Superpriority Post-Petition Financing and Utilize Cash Collateral (the "DIP Motion")**

101.    By the DIP Motion, the Debtors seek entry of interim and final orders, among other things: (i) authorizing the Debtors to obtain the post-petition debtor-in-possession financing ("DIP Financing") on a senior secured superpriority basis; (ii) authorizing use of cash collateral ("Cash Collateral"); (iii) granting priming liens, priority liens, and superpriority claims to the DIP Lender (as defined in the DIP Motion); (iv) granting adequate protection; and (v) granting related relief. Specifically, the Debtors have negotiated a post-petition financing facility to be provided by the DIP Lender in the aggregate principal amount of up to approximately $45 million.

102.     The Debtors require immediate access to liquidity to ensure that they can continue operating their business during these Chapter 11 Cases, preserve the value of their estates for the benefit of all parties in interest, and pursue a value-maximizing restructuring transaction.  Without prompt access to the DIP Facility and Cash Collateral, the Debtors will be unable to continue operating their facilities, thereby placing the health and welfare of thousands of men and woman in jeopardy; satisfy employee compensation obligations; pay necessary expenses; preserve and maximize the value of their estates; fund the administration of these Chapter 11 Cases; and provide the critical and necessary care to their thousands of residents, which would damage the value of the Debtors' estates to the detriment of all stakeholders.

103.     Absent the relief requested herein, the Debtors' ability to successfully reorganize would be jeopardized.  The Debtors will be forced to cease operations immediately if they are unable to procure the funds necessary to pay post-petition wages, salaries, and payroll taxes, maintain insurance coverage, pay taxes, and make any other payments necessary for the continued management, operation, and preservation of the Debtors' business during the pendency of these Chapter 11 Cases.  The ability to satisfy these expenses as and when due is essential to the Debtors' continued operations.  In particular, obtaining financing and the use of Cash Collateral is essential to the Debtors' ability to continue to serve their thousands of residents, maintain their business relationships with their employees, vendors and suppliers, and meet their ongoing obligations while finalizing and implementing their restructuring.

104.     As a result of the direct cyberattack, the Change Attack; inflationary pressures from food, drugs and medical supplies; difficulty recruiting experienced staff; and lingering effects of COVID-19, the Debtors faced liquidity issues and subsequently fell into default with their various credit facilities; given the Debtors' need to continue providing care to their residents, the Debtors,

in consultation with their advisors, deemed it necessary to forego principal and interest payments owed to their lenders and ensure continued critical resident care continue.  As these defaults mounted, receivership cases were filed, and the Debtors' liquidity issues worsened.  The filing of these Chapter 11 Cases became necessary after the Debtors' existing lenders declined to provide additional financing.

105.     Any lapse in operation, no matter how transitory, would have a devastating impact on the Debtors' resident care and also on the going concern value of the Debtors' business.  Since the Debtors have no available alternative sources of financing to fund these Chapter 11 Cases and their restructuring efforts, absent the DIP Financing and use of Cash Collateral, the Debtors cannot pay expenses necessary in the ordinary course of their business.  Without immediate access to both the DIP Financing and Cash Collateral, the Debtors' ability to operate and preserve the value of their business will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' residents, the Debtors' estates, and creditors.  The immediate use is necessary, and it will stabilize the Debtors' operations and revenue by paying ordinary, post-petition operating expenses, as well as any court-approved prepetition expenses that may be at issue.

106.     Among other things, the DIP Financing is essential to provide the Debtors with immediate and critical access to liquidity that is necessary to ensure that (a) the Debtors' business stabilizes, (b) the Debtors can pay chapter 11 administrative costs in full, (c) value is preserved during the course of these Chapter 11 Cases, and (d) the Debtors can refinance certain revolving indebtedness of the Debtors, which will allow for the Debtors to enjoy greater liquidity during these Chapter 11 Cases.

107.    For these reasons, the Debtors' management believes that the DIP Financing offered by the DIP Lender represents the best available option for the Debtors and will benefit all parties in interest.

108.    The DIP Financing and the other related agreements regarding the use of Cash Collateral and adequate protection are the result of extensive negotiations with the DIP Lender, conducted in good faith and at arm's length.  The Debtors and their advisors believe that the proposed DIP Financing is the only viable option available to the Debtors, and the Debtors have therefore negotiated to obtain the DIP Financing on the best and most realistic terms available. The circumstances of these Chapter 11 Cases necessitate post-petition financing under section 364(c) and (d) of the Bankruptcy Code, and the DIP Financing offered by the DIP Lender reflects the sound exercise of the Debtors' business judgment.

109.    The Debtors have been and are unable to obtain sufficient and otherwise viable financing without granting priming liens pursuant to section 364(d) of the Bankruptcy Code.  As described in more detail in the Andrews Declaration and my accompanying declaration in support, none of the alternative proposals they received that contemplated post-petition financing on an unsecured or non-consensual priming basis or on a priority junior to that of the Prepetition Lenders would have provided the Debtors with sufficient liquidity to fund these Chapter 11 Cases. Accordingly, the Debtors propose to obtain the DIP Financing by providing, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(l), (2), (3), and (d) of the Bankruptcy Code.

110.    Approval of the DIP Financing and the use of Cash Collateral will provide immediate access to capital that is needed to, among other things, pay employees and vendors while minimizing disruptions to day-to-day businesses, thereby preserving and maximizing the

value of the Debtors' estates.  Absent the DIP Financing, the Debtors' operations would come to a

halt, resulting in irreparable harm to their businesses and their going-concern value.

111.    Accordingly, for these reasons, I believe that the relief requested in the DIP Motion

is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

*[continued on the next page]*

113.    I declare under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.


Dated: March 21, 2024          _/s/ David R. Campbell_____
       Peoria, Illinois          Name: David R. Campbell
                    Title: Chief Restructuring Officer

**EXHIBIT A**

**Debtors and Their Non-Debtor Affiliates**

**DEBTORS**

1. Aledo HCO, LLC
2. Aledo RE, LLC
3. Arcola HCO, LLC
4. Arcola RE, LLC
5. Aspen HCO, LLC
6. Aspen RE, LLC
7. Bement HCO, LLC
8. Bement RE, LLC
9. Betty's Garden HCO, LLC
10. Betty's Garden RE, LLC
11. Bradford AL RE, LLC
12. Bushnell AL RE, LLC
13. Casey HCO, LLC
14. Collinsville HCO, LLC
15. Collinsville RE, LLC
16. CYE Bradford HCO, LLC
17. CYE Bushnell HCO, LLC
18. CYE Girard HCO, LLC
19. CYE Sullivan HCO, LLC
20. CYE Walcott HCO, LLC
21. CYV Kewanee AL RE, LLC
22. Decatur HCO, LLC
23. Decatur RE, LLC
24. Eastview HCO, LLC
25. Eastview RE, LLC
26. Effingham HCO, LLC
27. Effingham RE, LLC
28. Havana HCO, LLC
29. Havana RE, LLC
30. Jonesboro, LLC
31. Kewanee HCO, LLC
32. Kewanee, LLC
33. Knoxville & Pennsylvania, LLC
34. Lebanon HCO, LLC
35. Lebanon RE, LLC
36. Macomb, LLC
37. MBP Partner, LLC
38. McLeansboro HCO, LLC
39. McLeansboro RE, LLC
40. Midwest Health Operations, LLC
41. Midwest Health Properties, LLC
42. North Aurora HCO, LLC
43. North Aurora, LLC
44. Petersen 23, LLC
45. Petersen 25, LLC
46. Petersen 26, LLC
47. Petersen 27, LLC
48. Petersen 29, LLC
49. Petersen 30, LLC
50. Petersen Farmer City, LLC
51. Petersen Health & Wellness, LLC
52. Petersen Health Business, LLC
53. Petersen Health Care - Farmer City, LLC
54. Petersen Health Care - Illini, LLC
55. Petersen Health Care - Roseville, LLC
56. Petersen Health Care II, Inc.
57. Petersen Health Care III, LLC
58. Petersen Health Care Management, LLC
59. Petersen Health Care V, LLC
60. Petersen Health Care VII, LLC
61. Petersen Health Care VIII, LLC
62. Petersen Health Care X, LLC
63. Petersen Health Care XI, LLC
64. Petersen Health Care XIII, LLC
65. Petersen Health Care, Inc.
66. Petersen Health Enterprises, LLC
67. Petersen Health Group, LLC
68. Petersen Health Network, LLC
69. Petersen Health Properties, LLC
70. Petersen Health Quality, LLC
71. Petersen Health Systems, Inc.
72. Petersen Management Company, LLC
73. Petersen MT, LLC
74. Petersen MT3, LLC
75. Petersen MT4, LLC
76. Petersen Roseville, LLC
77. Piper HCO, LLC
78. Piper RE, LLC
79. Pleasant View HCO, LLC
80. Pleasant View RE, LLC
81. Prairie City HCO, LLC
82. Prairie City RE, LLC
83. Robings HCO, LLC
84. Robings, LLC
85. Rosiclare HCO, LLC
86. Rosiclare RE, LLC
87. Royal HCO, LLC
88. Royal RE, LLC
89. SABL, LLC
90. SC Healthcare Holding, LLC

91. Shangri La HCO, LLC
92. Shangri La RE, LLC
93. Shelbyville HCO, LLC
94. Shelbyville RE, LLC
95. SJL Health Systems, Inc.
96. South Elgin, LLC
97. Sullivan AL RE, LLC
98. Sullivan HCO, LLC
99. Sullivan RE, LLC
100. Swansea HCO, LLC
101. Swansea RE, LLC
102. Tarkio HCO, LLC
103. Tarkio RE, LLC
104. Tuscola HCO, LLC
105. Tuscola RE, LLC
106. Twin HCO, LLC
107. Twin RE, LLC
108. Vandalia HCO, LLC
109. Vandalia RE, LLC
110. Village Kewanee HCO, LLC
111. Walcott AL RE, LLC
112. War Drive, LLC
113. Watseka HCO, LLC
114. Watseka RE, LLC
115. Westside HCO, LLC
116. Westside RE, LLC
117. XCH, LLC
118. CYE Kewanee HCO, LLC
119. CYE Kewanee- PHC, Inc.
120. CYE Knoxville - PHC, Inc
121. CYE Knoxville HCO, LLC
122. CYE Monmouth - PHC, Inc
123. CYE Monmouth HCO, LLC
124. El Paso - PHC, Inc
125. El Paso HCC, LLC
126. El Paso HCO, LLC
127. Flanagan - PHC, Inc.
128. Flanagan HCC, LLC
129. Flanagan HCO, LLC
130. Kewanee AL, LLC
131. Knoxville AL, LLC
132. Legacy - PHC Inc.
133. Legacy Estates AL, LLC
134. Legacy HCO, LLC
135. Marigold - PHC Inc
136. Marigold HCC, LLC
137. Marigold HCO, LLC
138. Monmouth AL, LLC
139. Polo - PHC, Inc.
140. Polo HCO, LLC
141. Polo, LLC

## CERTAIN NON-DEBTOR AFFILIATES[22]

1. Batavia, LLC
2. Benton HCC, LLC
3. Bloomington, LLC
4. Candle Hospitality, LLC
5. Charleston - PHC, Inc.
6. Charleston HCC, LLC
7. Charleston HCO, LLC
8. Charter Bus Company, LLC
9. Cisne, LLC
10. Cumberland - PHC, Inc.
11. Cumberland HCC, LLC
12. Cumberland HCO, LLC
13. Eastside, LLC
14. Fondulac, LLC
15. Neeley, LLC
16. Neeley Incorporated Cell
17. Ozark HCC, LLC
18. Petersen Companies, LLC
19. Petersen Health Junction, LLC
20. Petersen Health Operations, LLC
21. Petersen Hospitality, LLC
22. Petersen Hotels, LLC
23. Petersen MT2, LLC
24. Plaza West Development, LLC
25. Sunset HCC, LLC
26. Timbercreek HCC, LLC
27. Twenty Four Corp, LLC

---

[22] The Petersen enterprise contains other dormant entities that constitute affiliates of the Debtors.

**<u>EXHIBIT B</u>**

**Map of Healthcare Facilities**

# Petersen Health Care
# Home Specialty Map



### Certified Alzheimer's & Dementia Care

Aledo RHCC
Flora Gardens Care Center
Mt. Vernon Health Care Center
Palm Terrace of Mattoon
Toulon RHCC
Watseka RHCC

### Memory Care

Casey Health Care Center
Eastview Terrace - *Sullivan, IL*
Lebanon Care Center
Prairie Rose Health Care Center - *Pana, IL*
Shangri-La RLC- *Blue Springs, MO*
Vandalia RHCC - *Vandalia, IL*

### Behavioral Health Services

Arcola Health Care Center
Countryview Care Center of Macomb
Palm Terrace of Mattoon
Royal Oaks Care Center - *Kewanee, IL*

### ADAPT - Behavioral Health Program Coordination

Collinsville RHCC
North Aurora Care Center

### Mental Health

North Aurora Care Center
Rochelle Gardens Care Center
Rock River Gardens - *Sterling, IL*
Westside RCC - *West Frankfort, IL*

### Developmentally Disabled

Countryview Terrace - *Louisville, IL*
Whispering Oaks Care Center - *Rosiclare, IL*

### Betty's Garden - Advanced Memory Care

Betty's Garden Memory Care of Kewanee
Courtyard Estates of Bushnell
Courtyard Estates of Farmington
Courtyard Estates of Walcott

### Supportive Living

Courtyard Estates of Canton
Courtyard Estates of Sullivan



"Caring with a Hometown Touch"




www.PetersenHealthCare.net | @PetersenHealthCare

**<u>EXHIBIT C</u>**

**Corporate Structure Charts**





**Global Note**:
References made herein to lenders shall refer generally to the lender (or lenders) that may have security interests in some or all of the assets owned by entities on that page. Such notations, including whether a person or entity is a borrower or guarantor, shall not be considered consent or waiver of the Debtors' rights and claims with respect to challenges of the nature, extent or priority of any of such lenders' liens, claims, or encumbrances, all of which remain preserved.

**GMF Petersen Note LLC**



**Mark B. Petersen**

100%

Petersen Health Systems, Inc. (IL)

100%                                    100%

Betty's Garden Memory Care of Kewanee

Betty's Garden RE, LLC (IL)

Betty's Garden HCO, LLC (IL)



Global Legend:

Debtor    Non-Debtor    *Facility*



Legend:

GMF Guarantor    eCapital Guarantor    GMF Borrower    eCapital Borrower



X-Caliber Funding, LLC
Mark B. Petersen
100%
CYE Kewanee- PHC, Inc. (IL)
1%
99%
Kewanee AL, LLC (IL)
Courtyard Estates of Kewanee
CYE Kewanee HCO, LLC (IL)
CYE Knoxville PHC, Inc. (IL)
Knoxville AL, LLC (IL)
Courtyard Estates of Knoxville
CYE Knoxville HCO, LLC (IL)
CYE Monmouth - PHC, Inc. (IL)
Monmouth AL, LLC (IL)
Courtyard Estates of Monmouth
CYE Monmouth HCO, LLC (IL)
EL Paso - PHC, Inc. (IL)
El Paso HCC, LLC (IL)
El Paso Health Care Center
El Paso, HCO, LLC (IL)
Flanagan - PHC, Inc. (IL)
Flanagan HCC, LLC (IL)
Flanagan Rehabilitation & Health Care Center
Flanagan HCO, LLC (IL)
MBP Partner, LLC (IL)
Petersen Health Care X, LLC (IL)
Facilities:
• Flora Gardens Care Center
• Nokomis Rehabilitation & Health Care Center
• Rochelle Gardens Care Center
• Rochelle Rehabilitation & Health Care Center
• Whispering Oaks Care Center
• Willow Rose Rehab & Health Care
Petersen Health Network, LLC (IL)
Legacy PHC, Inc. (IL)
Legacy Estates AL, LLC (IL)
Legacy Estates of Monmouth
Legacy HCO, LLC (IL)
Marigold –PHC, Inc. (IL)
Marigold HCC, LLC (IL)
Marigold Rehabilitation & Health Care Center
Marigold HCO, LLC (IL)
Polo – PHC, Inc. (IL)
Polo, LLC (IL)
Polo Rehabilitation & Health Care
Polo HCO, LLC (IL)
HUD LOANS
Charleston – PHC, Inc. (IL)
Charleston HCC, LLC (IL)
Charleston Rehabilitation & Health Care
Charleston HCO, LLC (IL)
Cumberland – PHC, Inc. (IL)
Cumberland HCC, LLC (IL)
Cumberland Rehabilitation & Health Care
Cumberland HCO, LLC (IL)
Global Legend:
Debtor
Non-Debtor
Facility
Legend:
X-Caliber Borrower
X-Caliber Guarantor





Capital Funding, LLC – HUD

Grandbridge Real Estate Capital LLC – HUD
Berkadia Commercial Mortgage LLC - HUD
Mark B. Petersen
Lument Real Estate Capital, LLC – HUD
100%
100%
100%
100%
100%
100%
100%
MBP Partner, LLC (IL)
Petersen Health Care III, LLC (IL)
99%
1%
100%
Petersen Health Properties, LLC (IL)
Countryview Care Center of Macomb
Macomb, LLC (IL)
Jonesboro Rehabilitation & Health Care Center
Jonesboro, LLC (IL)
South Elgin Rehabilitation & Health Care Center
South Elgin, LLC (IL)
Heritage Nursing Care, Inc. (IL) Dissolved
Illini Heritage Rehab & Health Care Center
Petersen Health Care - Illini, LLC (IL)
Petersen Roseville, LLC (IL)
Roseville Rehabilitation & Health Care Center
Petersen Health Care - Roseville, LLC (IL)
Petersen Health Care, Inc. (IL)
Courtyard Estates of Canton Lender: Solutions Bank
Riverview Estates of Havana
CYE Girard HCO, LLC (IL)
Courtyard Estates of Girard Lender: Hickory Point Bank
Petersen Health Systems, Inc (IL)
Courtyard Estates of Herscher Lender: Bank of Rantoul
Courtyard Estates of Farmington Lender: Bank of Farmington
Courtyard Estates of Galva Lender: Community State Bank
Courtyard Estates of Green Valley Lender: Community State Bank
Petersen Health Care II, Inc. (IL)
100%
100%
Petersen 23, LLC (IL)
Palm Terrace of Mattoon
Petersen 26, LLC (IL)
Flora Rehabilitation & Health Care Center
Petersen 27, LLC (IL)
Toulon Rehabilitation & Health Care Center
Petersen 29, LLC (IL)
Mt. Vernon Health Care Center
Petersen 30, LLC (IL)
White Oak Rehabilitation & Health Care Center
Petersen Management Company, LLC (IL)
Global Legend:
Debtor
Non-Debtor
Facility
Obligor to Respective Lender

## **EXHIBIT D**

### **Additional Credit Facility Information**

**EXHIBIT D**

| Instrument/Facility | Borrower | Guarantor | Approximate Amount (Principal) Outstanding |
|---|---|---|---|
| Sector Facility | Aledo Re, LLC<br>Arcola RE, LLC<br>Aspen RE, LLC<br>Bement RE, LLC<br>Bradford Al RE, LLC<br>Bushnell AL RE, LLC<br>Collinsville RE, LLC<br>CYV Kewanee AL RE, LLC<br>Decatur RE, LLC<br>Eastview RE, LLC<br>Effingham RE, LLC<br>Havana RE, LLC<br>Kewanee, LLC<br>Lebanon RE, LLC<br>McLeansboro RE, LLC<br>North Aurora, LLC<br>Petersen 25, LLC<br>Petersen Farmer City, LLC<br>Piper RE, LLC<br>Pleasant View RE, LLC<br>Prairie City RE, LLC<br>Robings, LLC<br>Rosiclare RE, LLC<br>Royal RE, LLC<br>SC Healthcare Holding, LLC<br>Shangri LA RE, LLC<br>Shelbyville RE, LLC<br>Sullivan AL RE, LLC<br>Sullivan RE, LLC<br>Swansea RE, LLC<br>Tarkio RE, LLC<br>Tuscola RE, LLC<br>Twin RE, LLC<br>Vandalia RE, LLC<br>Walcot AL RE, LLC<br>Watseka RE, LLC<br>Westside RE, LLC | Aledo HCO, LLC<br>Arcola HCO, LLC<br>Aspen HCO, LLC<br>Bement HCO, LLC<br>Casey HCO, LLC<br>Collinsville HCO, LLC<br>CYE Bradford HCO, LLC<br>CYE Bushnell HCO, LLC<br>CYE Sullivan HCO, LLC<br>CYE Walcott HCO, LLC<br>Decatur HCO, LLC<br>Eastview HCO, LLC<br>Effingham HCO, LLC<br>Havana HCO, LLC<br>Kewanee HCO, LLC<br>Lebanon HCO, LLC<br>Mark Petersen<br>McLeansboro HCO, LLC<br>North Aurora HCO, LLC<br>Petersen Health Care - Farmer City, LLC<br>Petersen Health Care II, Inc.<br>Petersen Health Care III, LLC<br>Petersen Health Care VIII, LLC<br>Petersen Health Care XI, LLC<br>Petersen Health Care, Inc.<br>Petersen Health Enterprises, LLC<br>Petersen Health Systems, Inc.<br>Petersent Health Care XIII, LLC<br>Piper HCO, LLC<br>Pleasant View HCO, LLC<br>Prairie City HCO, LLC<br>Robings HCO, LLC<br>Rosiclare HCO, LLC<br>Royal HCO, LLC<br>Shangri La HCO, LLC<br>Shelbyville HCO, LLC<br>Sullivan HCO, LLC<br>Swansea HCO, LLC<br>Tarkio HCO, LLC<br>Tuscola HCO, LLC<br>Twin HCO, LLC<br>Vandalia HCO, LLC<br>Village Kewanee HCO, LLC<br>Watseka HCO, LLC<br>Westside HCO, LLC | $64,605,074.40 |
| GMF Facility | SC Healthcare Holding, LLC<br>Betty's Garden RE, LLC<br>Aledo RE, LLC<br>Arcola RE, LLC<br>Aspen RE, LLC | Aledo HCO, LLC<br>Arcola HCO, LLC<br>Aspen HCO, LLC<br>Bement HCO, LLC<br>Casey HCO, LLC | $26,400,303 |

**EXHIBIT D**

| Instrument/Facility | Borrower | Guarantor | Approximate Amount (Principal) Outstanding |
|---|---|---|---|
| | Bement RE, LLC<br>Petersen 25, LLC<br>Collinsville RE, LLC<br>Bradford Al RE, LLC<br>Bushnell Al RE, LLC<br>Sullivan Al RE, LLC<br>Walcott Al RE, LLC<br>CYV Kewanee AL RE, LLC<br>Decatur RE, LLC<br>Eastview RE, LLC<br>Effingham RE, LLC<br>Havana RE, LLC<br>Kewanee, LLC<br>Lebanon RE, LLC<br>Mcleansboro RE, LLC<br>North Aurora, LLC<br>Petersen Farmer City, LLC<br>Piper RE, LLC<br>Pleasant View RE, LLC<br>Prairie City RE, LLC<br>Robings, LLC<br>Rosiclare RE, LLC<br>Royal RE, LLC<br>Shangri La RE, LLC<br>Shelbyville RE, LLC<br>Sullivan RE, LLC<br>Swansea RE, LLC<br>Tarkio RE, LLC<br>Tuscola RE, LLC<br>Twin RE, LLC<br>Vandalia RE, LLC<br>Watseka RE, LLC<br>Westside RE, LLC | Collinsville HCO, LLC<br>CYE Bradford HCO, LLC<br>CYE Bushnell HCO, LLC<br>CYE Sullivan HCO, LLC<br>CYE Walcott HCO, LLC<br>Decatur HCO, LLC<br>Eastview HCO, LLC<br>Effingham HCO, LLC<br>Havana HCO, LLC<br>Kewanee HCO, LLC<br>Lebanon HCO, LLC<br>Mark Petersen<br>Mcleansboro HCO, LLC<br>North Aurora HCO, LLC<br>Petersen Health Care - Farmer City, LLC<br>Petersen Health Care II, Inc.<br>Petersen Health Care III, LLC<br>Petersen Health Care VIII, LLC<br>Petersen Health Care XI, LLC<br>Petersen Health Care XIII, LLC<br>Petersen Health Care, Inc.<br>Petersen Health Enterprises, LLC<br>Petersen Health Systems, Inc.<br>Piper HCO, LLC<br>Pleasant View HCO, LLC<br>Prairie City HCO, LLC<br>Robings HCO, LLC<br>Rosiclare HCO, LLC<br>Royal HCO, LLC<br>Shangri La HCO, LLC HCO, LLC<br>Shelbyville HCO, LLC<br>Sullivan HCO, LLC<br>Swansea HCO, LLC<br>Tarkio HCO, LLC HCO, LLC<br>Tuscola HCO, LLC<br>Twin HCO, LLC<br>Vandalia HCO, LLC<br>Village Kewanee HCO, LLC<br>Watseka HCO, LLC<br>Westside HCO, LLC | |
| eCapital Facility | Aledo HCO, LLC<br>Arcola HCO, LLC<br>Aspen HCO, LLC<br>Bement HCO, LLC<br>Betty's Garden HCO, LLC<br>Casey HCO, LLC<br>Collinsville HCO, LLC<br>CYE Bradford HCO, LLC | Petersen Health Care, Inc.<br>Petersen Health Care II, Inc.<br>Petersen Health Systems, Inc.<br>Petersen Health Care VII, LLC<br>SABL, LLC | $3,929,221.00 |

**EXHIBIT D**

| Instrument/Facility | Borrower | Guarantor | Approximate Amount (Principal) Outstanding |
|---|---|---|---|
| | CYE Bushnell HCO, LLC<br>CYE Walcott HCO, LLC<br>Decatur HCO, LLC<br>Eastview HCO, LLC<br>Effingham HCO, LLC<br>Havana HCO, LLC<br>Kewanee HCO, LLC<br>Lebanon HCO, LLC<br>McLeansboro HCO, LLC<br>Midwest Health Operations, LLC<br>North Aurora HCO, LLC<br>Petersen Health & Wellness, LLC<br>Petersen Health Business, LLC<br>Petersen Health Care - Farmer City, LLC<br>Petersen Health Quality, LLC<br>Piper HCO, LLC<br>Pleasant View HCO, LLC<br>Prairie City HCO, LLC<br>Robings HCO, LLC<br>Rosiclare HCO, LLC<br>Royal HCO, LLC<br>Shangri La HCO, LLC<br>Shelbyville HCO, LLC<br>Sullivan HCO, LLC<br>Swansea HCO, LLC<br>Tarkio HCO, LLC<br>Tuscola HCO, LLC<br>Twin HCO, LLC<br>Vandalia HCO, LLC<br>Village Kewanee HCO, LLC<br>Westside HCO, LLC | | |
| X-Caliber Facility | CYE Kewanee HCO, LLC<br>CYE Knoxville HCO, LLC<br>CYE Monmouth HCO LLC<br>El Paso HCC, LLC<br>El Paso HCO, LLC<br>Flanagan HCC, LLC<br>Flanagan HCO, LLC<br>Kewanee AL, LLC<br>Knoxville AL, LLC<br>Legacy Estates AL, LLC<br>Legacy HCO, LLC<br>Marigold HCC LLC<br>Marigold HCO LLC<br>Monmouth AL LLC<br>Polo HCO LLC<br>Polo LLC | Mark Petersen<br>Petersen Health Care X, LLC<br>Petersen Health Network LLC | $29,986,931.00 |
| Berkadia Commercial Mortgage LLC | Petersen Champaign, LLC<br>Petersen Health Care – Illini, LLC<br>Petersen Roseville, LLC | | $2,936,067.00 |

**EXHIBIT D**

| Instrument/Facility | Borrower | Guarantor | Approximate Amount (Principal) Outstanding |
|---|---|---|---|
| Grandbridge Real Estate Capital LLC ("Grandbridge" or "Pillar") | Jonesboro, LLC Macomb, LLC South Elgin, LLC | | $8,906,654.00 |
| Lancaster Pollard Mortgage Company ("Lument") | Petersen 26, LLC Petersen 29, LLC Petersen 30, LLC Petersen 23, LLC Petersen 27, LLC | | $12,357,061.00 |
| Solutions Bank | Petersen Health Care, Inc. | Mark Petersen | $3,537,619.00 |
| Community State Bank | Petersen Health Systems, Inc. | Mark Petersen | $2,494,108.00 |
| Bank of Farmington | Petersen Health Systems, Inc. | Mark Petersen | $2,845,278.00 |
| Bank of Rantoul | Petersen Health Systems, Inc. | Mark Petersen | $2,352,907.00 |
| Hickory Point Bank and Trust | CYE Girard HCO, LLC | Mark Petersen | $1,839,599.00 |
| Wells Fargo | SJL Health Systems Inc. | | $2,158,632.00 |
| Other Secured Indebtedness | | | $981,233.00 |
| Unsecured Indebtedness | | | $130,525,878.00 |
| **Total Indebtedness** | | | **$295,856,565.40** |