# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**ROCKFORD DIVISION**

| | | |
|---|---|---|
| X-CALIBER FUNDING LLC, as servicer for XCAL 2019-IL-1 MORTGAGE TRUST, a New York Trust, | ) ) ) ) | No. 3:24-cv-50034 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EL PASO HCC, LLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**OMNIBUS MOTION FOR LEAVE TO INTERVENE AND TO OPPOSE**
**RECEIVER'S EMERGENCY MOTION TO CLOSE EL PASO FACILITY**

Third-Party, Mark B. Petersen (the "Intervening Party" or "Petersen"), by and through his attorneys, Saul Ewing LLP, respectfully moves this Honorable Court for an order (i) granting his intervention in the above-captioned matter pursuant to Federal Rule of Civil Procedure 24(a)(2), (ii) denying Receiver's Emergency Motion to Close the El Paso Facility, and (iii) entering a schedule allowing the Intervening Party the opportunity to file appropriate pleadings, which it has been denied due to the filing of the present motion on an "emergency" basis.[1] In support of this Motion, the Intervening Party states as follows:

---

[1] There is also no evidence to support the Receiver's claim that this Motion constitutes an "emergency." The Court's standing order defines an emergency as arising from an "unforeseen circumstance that arises suddenly and unexpectedly." In contrast, the basis for the alleged "emergency" here is the Receiver's assertion that the Motion is urgent so the "the 60-day window may promptly commence" [DE 54 ¶ 8]. However, this timeframe is neither sudden nor unforeseen; it is a planned and predictable occurrence that is unaffected by the Court's standard motion schedule. The Receiver's decision to label this Motion as an "emergency" appears to be a calculated attempt to expedite the process and avoid opposition to his underlying scheme as detailed herein.

## INTRODUCTION

Plaintiff X-Caliber Funding LLC, as servicer for U.S. Bank, N.A., trustee of the XCAL 2019-IL-1 Mortgage Trust ("Plaintiff" or "X-Caliber"), along with Receiver Michael F. Flanagan of Flanagan & Associates, L.L.C. (the "Receiver" or "Flanagan"), and the parties managing the El Paso facility—Joseph C. Tutera ("Tutera"), Walnut Creek Management Company, L.L.C. ("Walnut Creek"), and Illinois Debt Acquisition Company, L.L.C. ("IDAC")—have orchestrated a scheme to exploit Mark B. Petersen's prolonged hospitalization due to life-threatening liver failure, as well as a ransomware attack on several of his assisted living facilities. Their plan has aimed to collect a windfall by intentionally mismanaging and devaluing these facilities, including the El Paso facility, all while enforcing a personal guaranty against Petersen in a separate action currently pending in the U.S. District Court for the Southern District of New York, *X-Caliber Funding LLC, as servicer for U.S. Bank, N.A., as trustee of the XCAL 2019-IL-1 Mortgage Trust v. Mark B. Petersen*, Civil Action No. 1:24-cv-05529 (the "Guaranty Action").

In October 2019, X-Caliber issued a $40,000,000 loan (the "Loan") to ten Petersen-affiliated facilities (the "Facilities"), including the El Paso facility, secured by liens on all of their assets, and backed by Petersen's personal guaranty. Following a ransomware attack that disabled the Facilities' billing and payroll systems, X-Caliber opportunistically declared a default and accelerated the entire debt, despite the fact that no debt payments had been missed. At the same time, Petersen was hospitalized in Arizona, awaiting a life-saving liver transplant. X-Caliber seized the moment, initiating this action to install a receiver over most of the Facilities and persuading the U.S. Bankruptcy Court for the District of Delaware to exclude those Facilities from a related Petersen bankruptcy proceeding under the promise to fund operating shortfalls, install competent management, and maximize the value of the Facilities for creditors.

These promises were false. Instead, X-Caliber's hand-picked receiver, Flanagan, and his management company, Walnut Creek, have run the Facilities into the ground. Walnut Creek, under the control of Tutera—a long-time direct competitor of Petersen in the Illinois assisted living industry—has deliberately devalued the Facilities. Tutera, who was previously accused of engaging in a kickback scheme in a *qui tam* lawsuit brought on behalf of the United States and eleven states,[2] is using his position to destroy a rival and enrich himself. It is believed that he is actively relocating residents from the Petersen-managed Facilities to his own Tutera-owned assisted living homes.

X-Caliber has now assigned all debt under the Loan to IDAC, an entity controlled by Tutera, whose registered agent is none other than Flanagan, the appointed Receiver. This assignment allows Tutera to foreclose on and acquire the Facilities, including El Paso, for his own benefit at a significantly reduced price after months of devaluing them. As part of this scheme, Tutera assigned back to X-Caliber, all rights under the Guaranty so X-Caliber can leverage Petersen's growing financial exposure to maximize profits in the Guaranty Action.

In light of this scheme, designed to strip Petersen of his assets and undermine the value of the Facilities, Petersen seeks to intervene in this action pursuant to Fed.R.Civ.P. 24(a) for the limited purpose of opposing Flanagan's Emergency Motion to Close the El Paso Property [DE 54], and requests that the Court grant such additional relief as it deems just and equitable, including but

---

[2]     Tutera was previously accused of accepting millions of dollars in kickbacks from a seller of durable medical equipment and supplies.  In *United States ex rel. Bogina v. Medline Industries, Inc.*, Case No. 11-c-05373, 2015 WL 1396190 (N.D.Ill. Mar. 24, 2015) ("Bogina Matter"), Tutera and Walnut Creek were accused of accepting millions of dollars in kickbacks and bribes if it purchased the durable medical equipment from Medline Industries, Inc. ("Medline").  (Petersen Decl. ¶ 25). The Bogina Matter was a *qui tam* litigation brought by August Bogina, as relator on behalf of the United States and eleven (11) individual states.  Although the Bogina Matter dismissed claims against Tutera based on procedural and technical defects, the allegations against Tutera and Walnut Creek are specific and disturbing.

not limited to, entering a schedule allowing the Intervening Party the opportunity to file appropriate pleadings.

## BACKGROUND

### A.     Petersen's Interest in Litigation.

The proposed Intervening Party has a direct and substantial interest in the El Paso facility that is the subject of the Receiver's Emergency Motion to Close. In and around October 31, 2019, X-Caliber issued a loan to ten separate Petersen-affiliated facilities and their operating companies, including the El Paso facility, in the amount of $40,000,000, pursuant to the terms and conditions of the October 31, 2019, Loan Agreement ("Loan Agreement").[3] (Exhibit 1, Declaration of Mark B. Petersen Dated October 25, 2024, at ¶ 14) ("Petersen Decl."). Specifically, the Loan Agreement was between X-Caliber and El Paso HCC, LLC; Flanagan HCC, LLC; Kewanee AL, LLC; Knoxville AL, LLC; Legacy Estates AL, LLC; Marigold HCC LLC; Monmouth AL LLC and Polo LLC, which are owners of the property on which El Paso HCO, LLC; Flanagan HCO, LLC; CYE Kewanee HCO, LLC; CYE Knoxville HCO, LLC; Legacy HCO, LLC; Marigold HCO, LLC; CYE Monmouth HCO LLC and Polo HCO, LLC (collectively, the "Borrowers") operate skilled nursing and assisted living facilities. (*Id.*).

In return, X-Caliber became, among other things, the Borrowers' senior secured creditor with liens on all of their assets, including accounts receivable and real estate. The parties understood that the Loan was intended to be a bridge loan until the U.S. Department of Housing and Urban Development ("HUD") determined it would provide financing for each of the Facilities. HUD reviews applications on an individual basis, so the Loan from X-Caliber was necessary to

---

[3]     The Initial Loan Agreement was subsequently amended on or about February 24, 2021, to adjust the collateral subject to the Loan.  It was then subsequently amended on November 6, 2022, and November 13, 2023.  For purposes of this Motion, the subsequent amendments did not materially impact the relevant terms of the Loan Agreement.

provide a financing bridge until HUD completed its review and approved each of the Facilities. (Petersen Decl. ¶ 15).

The Facilities were some of the premier long-term care facilities in the Petersen Health Care portfolio, were relatively new facilities, and were believed by Petersen Health Care and X-Caliber as the most qualified and most likely to be accepted by HUD. (Petersen Decl. ¶ 16). X-Caliber expressly chose to provide the Loan based on the Facilities' premier condition. (*Id.*). In addition to the Loan Agreement, Petersen signed a personal guaranty for the Loan owed by Borrowers to X-Caliber (the "Guaranty"). (Petersen Decl. ¶ 17). Petersen and X-Caliber both understood that the value of the Facilities were far greater than the Loan. Petersen never would have signed the Guaranty had he believed the Loan was not over-collateralized, or there was any risk the Facilities were not of far greater value than the Loan. (*Id.*).

### B.     Ransomware Attack and X-Caliber's Default.

In and around October 2023, while Petersen was hospitalized and seeking a life-saving liver transplant, Petersen Health Care and some of its facilities fell victim to a ransomware attack that prevented it from utilizing its billing and computer systems. X-Caliber made no effort to help Petersen Health Care resolve its logistical setbacks or financial difficulties caused by the ransomware attack, nor did they alleviate any of the Loan Agreement's payment requirements in light of Petersen Health Care's daunting situation.

Despite great efforts by Petersen Health Care and its employees to function under such extreme conditions, X-Caliber took advantage of the attack (and Petersen's hospitalization in fall of 2023 while waiting for a life-saving liver transplant) to declare an Event of Default on December 29, 2023 (the "Default Notice"). Despite the tumultuous events affecting Petersen Health Care and the Facilities, the Borrowers still prioritized its obligations under the Loan. On December 29,

-5-

2023, the Borrowers made a $4.5 million payment to X-Caliber to pay down the Loan. Notably, X-Caliber waited to receive this payment before issuing the Default Notice later that very day.

### C.   Appointment of a Receiver and Walnut Creek Management.

On January 23, 2024, X-Caliber initiated a receivership proceeding in the above-captioned action, *X-Caliber Funding, et al. v. El Paso HCC, LLC et al., Case No. 3:24-cv-50034* (the "Receivership Action"). [DE 1]. Simultaneously, X-Caliber also filed an emergency motion for the appointment of a receiver over the Facilities. [DE 5]. As part of this action, X-Caliber proposed the appointment of Michael F. Flanagan of Flanagan & Associates, L.L.C. (the "Receiver" or "Flanagan"). [DE 5]. Flanagan is a direct competitor of Petersen Health Care. (Petersen Decl. ¶ 24).

X-Caliber's hand-picked Receiver then immediately retained Walnut Creek Management Company, LLC, run by Joseph Tutera who, like Flanagan, is a direct competitor of Petersen who operates assisted living facilities in the same geographic areas. (Petersen Decl. ¶ 24). X-Caliber's justification for the appointment of a receiver was that, among other things, a receiver would: (a) "stabilize the situation," (b) "assure creditors," and "carry out an organized sale of Defendants' assets that…creates recoveries for Defendants' creditors." [DE 5]. X-Caliber repeatedly stated that the purpose of the receiver was to place the Facilities "in the best position to preserve and maximize the remaining value of…[the] assets for the benefit of [ ] creditors." (Petersen Decl. ¶ 19). To keep the Facilities under the care of PHC "would be catastrophic for creditors." (*Id.*).

On January 25, 2024, at a hearing before the Court regarding X-Caliber's emergency motion for the appointment of a receiver, counsel for X-Caliber stated that X-Caliber would "fund the shortfalls on these facilities until they can be stabilized and sold." (Petersen Decl. ¶ 39). This statement was false. Upon information and belief, Tutera and Flanagan are very close personally,

and often work together on Flanagan's receiverships.[4] In fact, Flanagan & Associates, L.L.C., is located at 7611 State Line Road, Kansas City, Missouri in Suite 303, and Tutera Senior Living is also located at the same address but at Suite 301. (Petersen Decl. ¶ 21).

Tutera owns, operates and manages approximately 70 assisted living facilities in the Midwest, including ten (10) in the State of Illinois which are in direct competition with many Petersen Healthcare facilities. (Petersen Decl. ¶ 24). Tutera used to be the largest operator in the State of Illinois for health care facilities and, in fact, sold several such facilities to Petersen in the 1990s. On January 25, 2024, the Court appointed the Receiver, and Walnut Creek, and Tutera began managing the Facilities.

> **D.    Tutera and Walnut Creek's Management Devalues The Facilities and Harms Petersen's Collateral Assets Subject To The Guaranty Action.**

There is no evidence that Walnut Creek or the Receiver or X-Caliber have made any attempts to sell the Facilities since the Receiver's appointment. Despite promising the Court that the intent was to maintain the Facilities' values for their sale, no real estate broker has been hired to advertise or attempt to sell the Facilities. By contrast, virtually all of the facilities that were

---

[4]    1.    In re: South Park Care Associates, Inc. United States Bankruptcy Court for the Western District of Missouri, Western Division, Case No. 94-42992-11

2.    In re Stonebridge, L.L.C., et al., United States Bankruptcy Court for the Eastern District of Louisiana, New Orleans Division Case No.'s 97-14854, 97-14855, 97-14856, 97-14857, 97-14858 and 97-14859

3.    In re: Axiom Healthcare Services, Inc., et al., United States Bankruptcy Court for the Eastern District of Louisiana Case No.'s 99-11875-11, et seq.

4.    In re: Metro Health/Indiana, Inc. United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Case No. 02-63019

5.    In re: Southern Healthcare Systems, Inc. United States Bankruptcy Court for the Middle District of Louisiana, Baton Rouge Division, Case No. 02-11621

6.    Grand Court II – Overland Park Overland Park, Kansas

7.    In re: Robert E. Lee, LLC United States Bankruptcy Court for the Southern District of Indiana, New Albany Division, Case No. 05-92641-BHL-11

8.    In re: Pleasant Care Corporation, et al. United States Bankruptcy Court for the Central District of California, Los Angeles Division, Case No. LA 07-12312-EC

9.    In re: Haven Eldercare, LLC, et al. United States Bankruptcy Court for the District of Connecticut, New Haven Division, Case No. 07-32720

previously owned by Petersen Health Care but were subject to the Bankruptcy Court for the District of Delaware have already been sold.

Rather, X-Caliber and Walnut Creek have pursued their scheme of running the Facilities into the ground. X-Caliber and/or Walnut Creek immediately stopped making any interest payments or payments on taxes and insurance upon its appointment, thereby causing the amount owed to X-Caliber to increase dramatically. By contrast, the Borrowers made consistent payments since November 2019 on the Loan and payments towards taxes and insurance, which slowly decreased the amount owed on the Loan. Upon information and belief, X-Caliber and Walnut Creek intentionally stopped payments to increase the total amount Petersen would be liable for on the Guaranty.

Moreover, oversight and accountability of Tutera and Walnut Creek is now limited since, as noted in a Court filing, Tutera and Walnut Creek "moved billing, payroll and all operational management from the Petersen centralized management to management by his own new manager." (Petersen Decl. ¶ 27). Aside from periodic reports that the Receiver issues to the Court, which merely show a monthly financial statement, there is little to no oversight or questioning of Walnut Creek and Tutera's actions. (*Id.*).

Even in reviewing the reports issued by the Receiver, it is clear that the number of residents—or, the census—living at some of the Facilities is dropping precipitously. The Receiver's Fifth and Sixth Reports show that the total facility census for Polo HCO, LLC ("Polo") has dropped from 23.66 to 18 in only eight months. (Petersen Decl. ¶ 28). Likewise, Legacy HCO, LLC's census has dropped from 44 to 36.97, (*id.*), and El Paso HCO, LLC's ("El Paso") census dropped from 110.93 to approximately 94 over the same time period. (*Id.*).

Upon information and belief, Walnut Creek and Tutera instituted new policies that are intended to decrease the populations at the Facilities, thereby driving down their profitability and value. For instance, Walnut Creek and Tutera now require potential new patients reliant on Medicaid to be approved for Medicaid before being admitted into the Facilities. (Petersen Decl. ¶ 29). Many patients, however, particularly low-income individuals reliant on government aid, have tremendous difficulty completing the necessary applications and paperwork for Medicaid assistance. (*Id.*).

Previously, Petersen Health Care would admit Medicaid-qualified patients and assist them in completing the necessary applications for Medicaid. (Petersen Decl. ¶ 30). Walnut Creek and Tutera's change in policy precludes many low-income seniors from accessing the Facilities, resulting in the drop in census and revenues. More importantly, it is a disservice to low-income seniors in need of assisted living facilities. (*Id.*).

Additionally, neither Walnut Creek nor Tutera have sufficient (if any) experience managing assisted living facilities with a prominent mental health treatment center, which is the case in El Paso. (Petersen Decl. ¶ 31). Many of the mental health residents there are considered "hard to place," which means there are very few facilities that have the capability of addressing their complex and difficult mental health issues. (*Id.*). Treatment requires pragmatic and eclectic approaches from qualified medical providers—requirements Tutera and Walnut Creek do not have the capabilities or experience to address. As a result, El Paso's census has decreased as mental health residents need to seek care elsewhere, and Walnut Creek are not accepting new residents because of their lack of capabilities. (*Id.*).

As a result, at El Paso, revenues have decreased over the past eight (8) months from $667,854 to $507,105. (Petersen Decl. ¶ 32). Despite the drop in census, the total operating

expenses have inexplicably ballooned from $101,186 to $832,803 and, at one point, were as high as $854,998. (*Id.*). As a result, El Paso's net income has plummeted from earning $566,668 in January 2024 to losing $325,699 (-$325,699) in only approximately eight months. (*Id.*).

Similarly, Polo's revenue has also decreased from $203,406 to $123,794 during the same seven-month period and, like El Paso, its operating expenses have also significantly increased from $216,102 to $267,879 and, at one point, were as high as $280,464. (Petersen Decl. ¶ 33). It is inexplicable why operating costs have increased so significantly, when the total population of residents has decreased substantially during the same time period.

The same is true for almost all of the Facilities under Walnut Creek and Tutera's management: CYE Kewanee HCO, LLC went from a $7,955 net income in February 2024 to losing $5,193 by August 2024; Flanagan HCO, LLC earned $214,319 in January 2024, but lost $88,448 in August 2024; Marigold HCO, LLC earned $469,763 in January 2024, but lost $145,515 in August 2024.

Prior to the installation of Walnut Creek and Tutera, these Facilities were successful assisted living facilities. (Petersen Decl. ¶ 42). Tutera has also begun to personally "poach" key employees and staff away from Petersen Health Care and the Facilities, and work at Tutera's own facilities, in order to further undermine the success and capabilities of the Facilities. (Petersen Decl. ¶ 34). Tutera's intent to take over the Facilities for his own is evident since he told at least one regional staff member that they should leave Petersen Health Care for Tutera's facilities because "you are going to be working for us anyway." (*Id.*).

### E.     Receiver's Efforts To Close El Paso.

On October 8, 2024, the Receiver informed counsel that he intended to close El Paso because it was deemed unprofitable. This is a meritless justification only cements Walnut Creek and Tutera's intent to devalue the Facilities for the benefit of Tutera and X-Caliber. (Petersen Decl.

¶ 42). The Receiver claims that the "operating losses at El Paso are huge…with no end in sight" and therefore he determined that "El Paso cannot operate as a viable business entity." (Petersen Decl. ¶ 41). Accordingly, the Receiver has requested permission from the Court to seek closure from the Illinois Department of Public Health and relocate the majority of residents to "other facilities located through the State of Illinois" – no doubt, to many Tutera-owned facilities. (*Id.*).

The attempt to close El Paso is egregious and clearly exhibits Walnut Creek and X-Caliber's scheme to devalue the properties, because Walnut Creek and Tutera turned a profitable, successful assisted living facility into a financial failure. (Petersen Decl. ¶ 42). El Paso was one of Petersen Health Care's most successful assisted living facilities, and now, under Tutera's management, it cannot keep its doors open. The result of Tutera and Walnut Creek's mismanagement is that El Paso's value has plummeted and is now no longer eligible or likely to receive HUD approval.

**F.      X-Caliber Assigned The Debt To IDAC But Kept The Claim Against Petersen.**

On October 11, 2024, X-Caliber assigned all debt and accompanying loan documents to Illinois Debt Acquisition Company, LLC ("IDAC"). (Petersen Decl. ¶ 44). IDAC is a Missouri limited liability company that was organized by Tutera on or about October 11, 2024. (Petersen Decl. ¶ 45). IDAC's Articles of Organization ("Articles") were filed on the same day the debt was assigned to it from X-Caliber. Under the Articles, the Receiver, Flanagan, is listed as IDAC's registered agent while Tutera is the sole organizer listed.

On October 14, 2024, IDAC assigned back to X-Caliber, its claims against Petersen under the Guaranty in this Matter. (Petersen Decl. ¶ 47). As a result, Tutera, who utilized Walnut Creek to devalue the Facilities, can now foreclose on those properties and either keep them under IDAC or sell them at discount rates to other Tutera-owned entities.  Moreover, X-Caliber maintains its

Guaranty claims against Petersen for an ever-growing amount, as the Facilities continue to be devalued by Tutera. The result is grossly unjust.

## ARGUMENT

### I. PETERSEN IS ENTITLED TO INTERVENE AS A MATTER OF RIGHT TO PROTECT HIS DIRECT INTERESTS IN HIS COLLATERAL ASSETS.

Federal Rule of Civil Procedure 24(a)(2) imposes four requirements to intervene as a matter of right: (1) timeliness, (2) an interest relating to the subject matter of the main action, (3) potential impairment of that interest if the action is resolved without the intervenor, and (4) lack of adequate representation by existing parties. *Zurich Cap. Markets Inc. v. Coglianese*, 236 F.R.D. 379, 383 (N.D. Ill. 2006) (permitting a liquidator to intervene as of right in a securities action because the liquidator had a property interest in the same funds that were the subject of the litigation). In evaluating the motion to intervene, the district court must accept as true the non-conclusory allegations of the motion. *Id.* The district court should not dismiss a motion to intervene unless it appears to a "certainty" that the intervenor is not entitled to relief under any set of facts which could be proved under the complaint. *Id.* Petersen meets all four requirements and should be permitted to intervene as of right.[5]

### A. Petersen's Motion To Intervene Is Timely.

Petersen's Motion to Intervene is timely. The purpose of the timeliness requirement is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal. *Sokaogon*

---

[5]     Should the Court rule that Proposed Intervenor has not satisfied the requirements to intervene as a matter of right, the Court should allow the Proposed Intervenor to intervene under Rule 24(b)(2), which grants the Court discretion to permit intervention "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b)(2). A key question of law and fact that exists in this action as to whether the assets under management by Receiver are being intentionally and willfully devalued to the detriment of Proposed Intervenor, which is actively subject to counterclaims filed on October 23, 2024 in *X-Caliber Funding LLC, as servicer for U.S. Bank, N.A., as trustee of the XCAL 2019-IL-1 Mortgage Trust v. Mark B. Petersen*, Civil Action No. 1:24-cv-05529 (the "Guaranty Action").

*Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000). "Whether a motion to intervene was made in a timely fashion is determined by reference to the totality of the circumstances." *Shea v. Angulo*, 19 F.3d 343, 348 (7th Cir.1994) (citing *Schultz v. Connery*, 863 F.2d 551, 553 (7th Cir.1988)). "There are four factors that should be considered in making such a determination: (1) The length of time the intervenor knew or should have known of his interest in this case, (2) the prejudice to the original parties caused by the delay, (3) the resulting prejudice to the intervenor if the motion is denied, and (4) any unusual circumstances." *Id*. at 348-49. The Seventh Circuit has made clear that intervenors are not "on the clock at the moment the suit is filed or even at the time they learn of its existence. Rather *we determine timeliness from the time the potential intervenors learn that their interest might be impaired*." *Reich v. ABC/York-Estes Corp*., 64 F.3d 316, 322 (7th Cir. 1995) (emphasis added); *see also U.S. v. City of Chicago,* 870 F.2d 1256, 1263 (7th Cir. 1991) (petition for intervention held to be timely even though filed eight years after consent decree entered because petitions were filed soon after potential intervenors learned of the impairment of their interests); *South* v. *Rowe,* 759 F.2d 610, 612 (7 Cir. 1985) (same result for petition filed two years after consent decree entered).

Here, Petersen's motion to intervene is unquestionably timely and was filed within approximately one week of discovering X-Caliber's "emergency" motion to close the El Paso facility. Indeed, no existing party would be prejudiced by his intervention beyond Plaintiffs being forced to prove their allegations that the El Paso facility is a financial failure. In contrast, the prejudice that would result from the Court's refusal to allow Petersen to intervene would be substantial because allowing Flanagan to close the El Paso facility and either keep it under IDAC or sell it at a discount to other Tutera-entities, actively devalues Petersen's assets and increases his exposure to the claims against him in the New York Guaranty Action.

-13-

### B.     Petersen Has A Strong Interest In The Instant Action.

Next, the Court must assess whether the intervening party has asserted an interest in the subject matter of the action. *See Zurich Cap. Markets Inc.*, 236 F.R.D. at 385. The Seventh Circuit has required the potential intervenor's interest be a "direct, significant legally protectable one." *Reich*, 64 F.3d at 322. The focus of this inquiry is "on the issues to be resolved by the litigation and whether the potential intervenor has an interest in those issues." *Id*. The requisite interest "is something more than a mere 'betting' interest . . . but less than a property right." *Security Ins. Co. of Hartford v. Schipporeit, Inc*., 69 F.3d 1377, 1380-81 (7th Cir.1995) (internal citations omitted).

Here, Petersen clearly has a vested financial interest in the outcome of X-Caliber's Emergency Motion to Close the El Paso facility. In October 2019, X-Caliber issued the Loan to ten separate Petersen-affiliated facilities and their operating companies, which includes the El Paso facility, in the amount of $40,000,000 in return for, among other things, liens on all assets of those facilities, as well as a personal guaranty by Petersen.  Presently, X-Caliber has filed suit in the Southern District of New York to enforce Petersen's personal guaranty of the Loan.[6] As a result, X-Caliber maintains its guaranty claims against Petersen for an ever-growing amount – because, as the Facilities continue to be devalued by Tutera, the amount that Petersen owes personally increases.  Petersen's interest is, therefore, akin to a property interest rather than a "betting" interest. *Zurich Cap. Markets Inc*., 236 F.R.D. at 385–86; *see also Citibank, N.A. v. Park-Kenilworth Indus., Inc*., 109 B.R. 321 (N.D.Ill. 1989) (holding that the bankruptcy trustee, who had a duty to protect the assets of the estate, had an interest in the subject matter of the action and could intervene as a right); *Mountain Top Condo. Ass'n*, 72 F.3d at 368 ("[W]hile the [intervenors]

---

[6]     *X-Caliber Funding LLC, as servicer for U.S. Bank, N.A., as trustee of the XCAL 2019-IL-1 Mortgage Trust v. Mark B. Petersen,* Civil Action No.: 1:24-cv-05529 (the "Guaranty Action").

may not have an interest in the merits of the claims pending [in the action] . . . they do have an interest in the property over which the court has taken jurisdiction. Clearly they have an interest in being heard with respect to the disposition of that fund.").

### C. *Petersen's Rights Will Be Adversely Impacted If He Is Not Permitted To Intervene.*

Petersen's rights will be significantly and adversely affected if intervention is denied. Courts consistently allow third parties to intervene when a receiver's actions directly harm their ability to protect their financial interests. *See Zurich Capital Markets Inc.*, 236 F.R.D. at 379; *Big Shoulders Capital LLC v. San Luis & Rio Grande Railroad, Inc.*, 13 F.4th 560, 568 (7th Cir. 2021). In *Zurich Capital Markets Inc.*, the court permitted a liquidator to intervene as of right, reasoning that the intervenor had sufficiently shown that a ruling on a motion for default judgment could, "as a practical matter," impair the liquidator's ability to protect the assets of the bankruptcy estate. *Id*.

Similarly, in *Big Shoulders Capital LLC*, the court allowed an unsecured creditor to intervene because the receiver's actions—specifically, entering into an agreement with the IRS—harmed the creditor's ability to enforce its judgments or debts against a financially distressed defendant. The court explained that these "pocketbook injuries" alleging monetary harm were "paradigmatically concrete" and sufficient to confer Article III standing. *Big Shoulders Capital LLC*, 13 F.4th at 568.

Here, the potential harm to the Petersen is a textbook "pocketbook" injury. If the El Paso facility (and potentially others) is closed, and Tutera—a direct competitor—gains the opportunity to sell El Paso's assets at a discount, this will devalue the collateral at issue in the Guaranty Action pending in the Southern District of New York. This financial harm mirrors the type of injury courts consistently deem sufficient for intervention as of right.

Additionally, the proposed 60-day notice period for relocating residents, while seemingly orderly, is inadequate to protect the vulnerable mental health residents at the El Paso facility. Many of these residents are considered "hard to place" and require specialized care that few facilities can provide. The El Paso facility, with its integrated mental health treatment center, addresses complex issues requiring eclectic and pragmatic approaches from qualified medical providers—expertise that Tutera and Walnut Creek demonstrably lack. Their inexperience in handling such specialized care puts the well-being of these residents at serious risk.

Accordingly, not only would the Intervening Party's rights be directly impacted by the closure of the El Paso facility, but the rights and well-being of the residents would also suffer without Petersen's intervention. The Court should allow intervention to safeguard both the Intervening Party's financial interests and the health and safety of the El Paso residents.

### D. No Existing Party Adequately Represents Petersen.

Finally, the Court must assess whether any existing party to the litigation adequately represents Petersen's interests. "[T]he Supreme Court in articulating the standard under this . . . element of Rule 24(a)(2) has stated that this 'requirement of the Rule is satisfied if the applicant shows that representation of his interest may be inadequate; and the burden of making that showing should be treated as minimal.'" *Lake Investors Development Group*, 715 F.2d at 1261 (*citing Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n. 10 (1972). "[W]here it is established that the parties have the same ultimate objective in the underlying action, the intervenors must demonstrate, at the very least, that some conflict exists." *Meridian Homes Corp.*, 683 F.2d at 205.

Petersen has met this minimal burden. The current parties to this lawsuit have taken positions that are directly adverse to those of Petersen and, indeed, have taken positions that undermine the value of his assets and increase his legal exposure in the Guaranty Action. Thus, the current parties cannot be said to adequately represent Petersen's interests. *Hartford Acc. &*

-16-

*Indem. Co. v. Crider,* 58 F.R.D. 15, 18 (N.D. Ill. 1973) (finding that where a purported representative of the applicant's interest actually represents an interest adverse to that of the applicant, the representation is not adequate).

## II. RECEIVER'S EMERGENCY MOTION TO CLOSE THE EL PASO FACILITY SHOULD BE DENIED.

The Receiver's request to close the El Paso facility is not only egregious but also exposes the Receiver's and Tutera's calculated effort to devalue the Facilities. The Receiver has taken what was a profitable and successful assisted living operation and, in a matter of months, turned it into an alleged financial failure, as outlined above. The order appointing the Receiver explicitly requires the Receiver to "prevent waste, and to preserve, manage, secure, and safeguard the Receivership Assets." [DE 8, ¶ 3]. The appointment order further limits the Receiver's liability, specifying that:

> Except in instances of willful misconduct, the liability of Receiver and any person engaged by Receiver hereunder is and shall be limited to the Receivership Assets, and neither Receiver nor any person or entity engaged by Receiver hereunder shall be personally liable for any actions taken pursuant to this Order or carrying out Receiver's duties, excepting only claims which arise from the willful misconduct of such person as determined by a final order of this or another Court of competent jurisdiction. In carrying out Receiver's duties as set forth herein, Receiver is entitled to act in the exercise of Receiver's own sound business judgment as Receiver deems appropriate within Receiver's sole discretion subject only to the terms of this Order and applicable law. Receiver shall not be liable for any action taken or not taken by Receiver in good faith and shall not be liable for any mistake of fact or error of judgment or for any acts or omissions of any kind unless caused by willful misconduct or gross negligence.

[DE 8, ¶ 21].

Here, the Receiver and his management entity have acted in self-interest, demonstrating bad faith and willfully undermined the value of the Receivership assets. The Receiver's so-called "emergency" motion offers nothing more than a conclusory statement that "the Property cannot

operate as a viable business entity" [DE 54, ¶ 3], without explaining how a once-profitable enterprise deteriorated under his stewardship.

However, ample evidence points to a deliberate scheme orchestrated by X-Caliber, Flanagan, and Joseph Tutera's entities, Walnut Creek and IDAC, to devalue certain collateralized assisted living facilities while enforcing personal guarantees against Petersen. Notably, while X-Caliber assured the Court that it would cover any shortfalls at the Facilities to preserve their value, (Petersen Decl. ¶ 39), it and/or Walnut Creek immediately ceased making interest payments, tax payments, and insurance payments upon being appointed, leading to a sharp increase in the amount owed in the Guaranty Action.

Moreover, oversight and accountability over Tutera and Walnut Creek's management are now severely restricted. As noted in a court filing, they "moved billing, payroll, and all operational management from Petersen's centralized system to a new management entity," (Petersen Decl. ¶ 27), limiting transparency. Despite this, the Receiver's own reports show that the census—the number of residents—at these facilities has dropped precipitously. For example, Polo HCO, LLC's ("Polo") census fell from 23.66 to 18 residents in just eight months. Legacy HCO, LLC saw its census drop from 44 to 36.97, and El Paso HCO, LLC ("El Paso") experienced a decline from 110.93 to 94 during the same period. (Petersen Decl. ¶ 28).

It appears that Walnut Creek and Tutera have instituted new policies designed to reduce the number of residents, thereby driving down the facilities' profitability and value. For instance, Walnut Creek and Tutera now require potential Medicaid patients to secure pre-approval for Medicaid before being admitted. This new policy disproportionately affects low-income patients, many of whom struggle to complete the required paperwork for Medicaid assistance. Under Petersen's management, Medicaid-eligible patients were admitted and assisted with the

application process. Now, Walnut Creek and Tutera's policy effectively bars many low-income seniors from accessing these Facilities, resulting in a reduced census and decreased revenues.

At El Paso, for example, revenues have plummeted from $667,854 to $507,105 over the past eight months, while operating expenses have inexplicably ballooned from $101,186 to $832,803, with some periods seeing costs as high as $854,998. (Petersen Decl. ¶ 32). As a result, El Paso's net income has dramatically shifted from a profit of $566,668 in January 2024 to a loss of $325,699 within six months (Petersen Decl. ¶ 32). Similar financial mismanagement is evident at Polo, where revenues decreased from $203,406 to $123,794, while operating expenses surged from $216,102 to $267,879 over the same period, despite a declining resident population (Petersen Decl. ¶ 33).

This pattern is consistent across the Facilities under Walnut Creek and Tutera's management: CYE Kewanee HCO, LLC went from a net income of $7,955 in February 2024 to a loss of $5,193 by August 2024; Flanagan HCO, LLC's earnings of $214,319 in January 2024 turned into a loss of $88,448 in August 2024; and Marigold HCO, LLC saw its net income of $469,763 in January 2024 drop to a loss of $145,515 by August 2024.

These Facilities were profitable prior to Walnut Creek and Tutera's mismanagement. The Receiver's assertion that "operating losses at El Paso are huge . . . with no end in sight," (Petersen Decl. ¶ 41), is disingenuous and reflects the self-inflicted financial instability caused by Flanagan, Tutera, and their entities. The Receiver's request to close El Paso and relocate its residents is clearly designed to funnel them to other Tutera-owned facilities.

In short, El Paso's purported lack of financial viability is entirely a result of Plaintiffs' willful mismanagement. The Court should deny the Receiver's Emergency Motion to close the El Paso facility, enforce Paragraph 3 of the appointment order to "preserve, manage, secure, and

safeguard the Receivership Assets," and grant any other relief it deems appropriate under Paragraph 21 of the appointment order. [DE 8].

## <u>CONCLUSION</u>

WHEREFORE, for the reasons set forth above, Mark B. Petersen respectfully requests that this Court (i) grant leave to intervene as a matter of right pursuant to FRCP 24(a) or, alternatively, intervene pursuant to FRCP 24(b), (ii) deny Receiver's Emergency Motion to Close the El Paso Facility, and (iii) entering a schedule allowing the Intervening Party the opportunity to file appropriate pleadings, and (iv) grant such additional relief as this Court finds to be just and necessary.

**SAUL EWING LLP**

By: */s/ Barry A. Chatz*
    Barry A. Chatz
    George P. Apostolides
    Andrew E. Bollinger
    161 North Clark Street, Suite 4200
    Chicago, IL 60601
    Barry.chatz@saul.com
    George.apostolides@saul.com
    Andrew.bollinger@saul.com
    *Attorneys for Intervening Party Mark B.*
    *Petersen*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was filed with the Clerk on this, the 25th day of October, 2024, and distributed to all counsel of record via the CM/ECF service list.

*/s/ Barry A. Chatz*

-20-